## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.,* | ) | Case No. 20-12522 (JTD) |
| | ) | (Jointly Administered) |
| _____Debtors._____ | ) | |
| OPIOID MASTER DISBURSEMENT | ) | |
| TRUST II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 22-50433(JTD) |
| | ) | |
| COVIDIEN UNLIMITED COMPANY | ) | |
| (formerly known as Covidien Ltd. and | ) | |
| Covidien plc), COVIDIEN GROUP | ) | |
| HOLDINGS LTD. (formerly known as | ) | |
| Covidien Ltd.), COVIDIEN | ) | |
| INTERNATIONAL FINANCE S.A., | ) | |
| COVIDIEN GROUP S.A.R.L., and DOE | ) | |
| DEFENDANTS 1-500, | ) | |
| | ) | |
| _____Defendants._____ | ) | **Re: Adv. D.I. 13, 33[1]** |


## OPINION

Plaintiff, Opioid Master Disbursement Trust II (the "**Trust**"), commenced this action

asserting claims arising from the 2013 spinoff (the "**Spinoff**") of the debtors in the above-

captioned chapter 11 cases (collectively "**Debtors**" or "**Mallinckrodt**") from the corporate

enterprise of the defendants, Covidien.[2]  The Trust seeks to avoid and recover several alleged

---

[1] References to filings in this adversary proceeding will be denoted as "Adv. D.I." and citations to entries on the docket in the bankruptcy will be denoted as "D.I.".

[2] The term "**Covidien**" includes defendants Covidien Unlimited Company, formerly known as Covidien Ltd. and Covidien plc (hereinafter referred to as "**Covidien plc**"), Covidien Group Holdings Ltd., formerly known as Covidien Ltd. ("**Covidien Ltd**"), Covidien International Finance S.A. ("**CIFSA**"), and Covidien Group S.a.r.l. ("**Covidien Group SARL**").  Covidien Group SARL was a wholly owned subsidiary of CIFSA, which was a wholly owned subsidiary of Covidien Ltd., which was a wholly owned subsidiary of the ultimate parent, Covidien plc.

fraudulent transfers that made up the Spinoff, including (a) approximately $867 million in cash transfers made between 2010 through 2012; (b) Covidien's retention of approximately $721 million in proceeds from Mallinckrodt's 2013 issuance of senior unsecured notes; (c) Mallinckrodt's assumption of hundreds of millions of dollars of tax liability previously held by Covidien; (d) Mallinckrodt's assumption of indemnification obligations to Covidien; and (e) the value of the enterprise (without the Debtors' pharmaceutical business) that was transferred away from the Debtors as a result of the Spinoff (collectively the "**Transfers**").  Additionally, the Trust asserts numerous other claims arising from the Spinoff, including breach of fiduciary duty, contribution, and equitable subordination.

Covidien moved to dismiss the claims pursuant to Federal Rule of Civil Procedure 12(b)(6), applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012 (the "**Motion to Dismiss**" or "**Motion**").[3]  In response to the Motion to Dismiss, the Trust filed a motion to amend the complaint (the "**Motion to Amend**").[4]  Both motions were fully briefed and argued together at a hearing held on August 16, 2023.[5]  For the reasons set forth below, both motions are granted in part and denied in part.

---

[3] Adv. D.I. 13 (Motion to Dismiss).

[4] Adv. D.I. 33 (Motion to Amend).

[5] Adv. D.I. 15 (Opening Brief in Support of Motion to Dismiss); Adv. D.I. 23 (Brief in Opposition to Motion to Dismiss); Adv. D.I. 26 (Reply Brief in Support of Motion to Dismiss); Adv. D.I. 33 (Motion to Amend); Adv. D.I. 41 (Objection to Motion to Amend); Adv. D.I. 47 (Reply Brief in Support of Motion to Amend); Adv. D.I. 56 (Transcript of Oral Argument).

## FACTUAL BACKGROUND[6]

The facts alleged in the Amended Complaint are assumed to be true for purposes of this motion to dismiss,[7] and are as follows:

**The Parties**

Mallinckrodt, originally formed in 1867 in St. Louis, Missouri, is a global enterprise that develops, manufactures, and sells pharmaceutical products, including opioids.

In 2007, Mallinckrodt's then-parent, Tyco International Ltd., separated into three companies, and its healthcare business, which included its pharmaceutical business, became a part of the Covidien enterprise.

Though consisting of many separate corporate entities, the Covidien enterprise operated as a fully-integrated company, maintaining an organizational structure that consolidated the design, manufacturing, marketing, sales, promotion, supply, reporting, compliance, administration, and cash management functions of its many companies into a single unified economic entity.[8]  The board of directors of Covidien plc managed both Covidien plc and its subsidiaries, exercising control over the day-to-day affairs of the businesses as well as their finances, business practices, policies, reporting, compensation, sales and marketing strategies.[9]

Covidien plc filed its financial results on a consolidated basis, reporting net sales by business segment, not subsidiary, and offset its losses against its gains as a single economic

---

[6] Due to the pendency of the Motion to Amend simultaneously with the Motion to Dismiss, I have evaluated the sufficiency of each of the Trust's claims pursuant to both Rule 12(b)(6) and Rule 15.  For ease of reference, I will refer primarily to the allegations contained in the proposed First Amended Complaint (the "**Amended Complaint**"), referring only to those contained in the original complaint (the "**Original Complaint**") as needed to explain the reasons for my ruling on the Motion to Amend.

[7] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (on a motion to dismiss for failure to state a claim, the court "must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions").

[8] Amended Complaint, ¶ 141.

[9] *Id.* ¶¶ 161-162.

entity.  Segment reporting allowed Covidien plc's board and officers to determine how business segments were constructed, what business metrics were reported, and how resources were allocated across the enterprise.[10]  Covidien maintained an integrated cash management system and routinely commingled funds and assets among its various businesses through intercompany transfers.[11]

Thus, while Mallinckrodt remained a separate corporate entity on paper, once a part of the Covidien enterprise, Mallinckrodt ceased operating as a standalone entity and was considered both internally and externally to be Covidien's pharmaceutical segment.

**The Opioid Landscape in the Early 2000s**

Due to concerns about addiction, opioid pain relievers had traditionally been reserved for patients with the most serious conditions, such as cancer.  But beginning in the 1990s, pharmaceutical manufacturers began to engage in marketing and promotional campaigns designed to persuade prescribers and patients that opioids were in fact safe, effective, non-addictive, and appropriate for individuals experiencing virtually any type of chronic pain.[12]  As a result, healthcare providers began to prescribe opioids in mass quantities.

Throughout the early 2000s, Mallinckrodt's opioid business was substantial, both in terms of production and market share.[13]  Mallinckrodt's leading branded opioid was an extended-release form of hydromorphone hydrochloride that was sold under the brand name Exalgo ("**Exalgo**").  Mallinckrodt also manufactured and sold generic versions of oxycodone, hydrocodone, and other opioid products.[14]

---

[10] *Id.* ¶ 143.
[11] *Id.* ¶ 144.
[12] Amended Complaint ¶ 35.
[13] *Id.* ¶ 33, 34.
[14] *Id.* ¶ 30.

Though reports of increased opioid abuse and diversion of opioid products began to surface by the year 2000, it was not until the second half of the decade that opioids became a potentially significant source of liability for those who manufactured and sold them.

The first major pharmaceutical company to face opioid-related liability was Mallinckrodt competitor Purdue Pharma ("**Purdue**").  In 2007, Purdue entered into a settlement resolving government investigations into the company's aggressive and deceptive marketing of its opioid products, most notably OxyContin, for $19.5 million.[15]  Also in 2007, Purdue's affiliate Purdue Frederick Company pled guilty to one felony count of misbranding OxyContin, with the intent to defraud or mislead, and three of its corporate officers also pled guilty to misdemeanor charges of misbranding.[16]  In resolving the matters against it, Purdue Frederick Company admitted that from 1995 to 2001 it "marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications," despite knowing these claims were untrue.  As part of the plea agreement, Purdue Frederick agreed to pay over $600 million in fines and various other payments to settle related civil claims which was, at the time, one of the largest monetary sanctions imposed in the history of the pharmaceutical industry.[17]

**Mallinckrodt's Opioid Business**

Despite the fact that scrutiny on companies in the opioid business was increasing, by September 2008, Mallinckrodt's profits from opioid sales had skyrocketed, leading one vice president of sales to refer to the growing oxycodone business as a "new economy."[18] Between

---

[15] *Id.* ¶ 193.
[16] *Id.* ¶ 194.
[17] Amended Complaint ¶ 194.
[18] *Id.* ¶ 35.

2006 and 2014, Mallinckrodt was the largest manufacturer, marketer, and producer of opioid products in the United States, with a 23% market share.[19]

Mallinckrodt employed a sales force of approximately 200 representatives who were collectively responsible for about $400 million in sales from the business's branded opioid products.  This vast network of sales representatives was incentivized to aggressively sell opioids using false and misleading claims about the benefits of opioids to prescribers while downplaying the risk of abuse and addiction.  Representatives were evaluated, and their compensation determined, primarily by the number of opioid prescriptions that they sold.[20]

The company also recruited and compensated top prescribers, referred to as "Key Opinion Leaders" to help promote its opioid products by speaking at or attending events designed to promote opioid products, delivering scripted talks about Mallinckrodt's opioids, and drafting misleading studies, among other things.  Physicians selected for these programs attended trainings that Mallinckrodt hosted and delivered presentations to medical community peers at expensive restaurants and resorts.[21]

By 2009, more manufacturers and distributors of opioid products came under fire by the Drug Enforcement Administration (the "**DEA**").  The company learned that "the sale of controlled substances to dispensers by distributors has come under great debate and concern from the DEA.  Many wholesale drug distributors have already had significant fines and had to add to their existing protocols."  Similarly, a Mallinckrodt director of security admitted, "we are very aware of the multi-million-dollar fines levied against Cardinal Health and McKesson for not being diligent with regard to sales."[22]

---

[19] *Id.* ¶ 33.
[20] *Id.* ¶ 38.
[21] *Id.* ¶¶ 82-84.
[22] *Id.* ¶ 132.

On January 7, 2009, Mallinckrodt received the first of what would eventually become many subpoenas from government investigators; this one from the U.S. Attorney's Office in the Northern District of California regarding the sales and monitoring of certain drugs, including Magnacet, one of Mallinckrodt's opioid products.[23]

In subsequent months, following the widespread misuse of Purdue's opioid product, OxyContin, there was significant pressure on opioid manufacturers to ensure that their opioid products were "abuse-deterrent." Mallinckrodt's leading product, Exalgo, was coming up short. A June 2009 internal presentation stated that while "originally [] Exalgo was believed to be less abusable, through due diligence this profile was not validated. . . Hydromorphone [the active ingredient in Exalgo] is one of the most widely abused narcotics and one of the most potent . . . . There is not sufficient clinical or scientific evidence available to suggest that Exalgo should be treated differently than Palladone."[24] That same month, an internal analysis of the risks of Exalgo stated that

> since there is only immediate release hydromorphone product on the market, once Exalgo is launched the abuse will increase. We don't know how much abuse or how fast the abuse will occur or what the FDA's tolerance to these issues will be. Given their experience with current opioid abuse situation [*sic*] and their history with Palladone, it is not likely to be a high tolerance threshold. This . . . could trigger a severe reaction by the Agency.[25]

Mallinckrodt marketed Exalgo as abuse-deterrent, despite possessing ample information that suggested it was not. For example, marketing materials for Exalgo stated that "the physical properties of EXALGO may make it difficult to extract the active ingredient using common forms of physical and chemical tempering, including chewing, crushing and dissolving," and training materials used by sales representatives described Exalgo as "specifically designed for

---

[23] Amended Complaint ¶ 235.
[24] *Id.* ¶ 56.
[25] *Id.*

gradual release over 24 hours" and having "a barrier to crushing [or] chewing."[26]  The Food and Drug Administration ("**FDA**") rejected Mallinckrodt's abuse deterrent claims, stating that a human bite was enough to break open a tablet of Exalgo.[27]

In September 2009, a senior manager of the controlled substances compliance group at the company circulated an article highlighting opinions from a panel of medical experts about Exalgo's high abuse potential.  The article quoted the panel chairman stating that Exalgo was "very prone to crushing and other methods of abuse compared to other opioid painkillers. On the spectrum of abuse, I think it's toward the top."[28]

In February 2010, a Wells Fargo analysis circulated widely within Covidien stated that "the FDA panel [that reviewed Exalgo] believed that Exalgo has a significant potential for abuse."[29]

A pharmaceutical consultant retained by the company in March 2010 reported that common prescriber objections to Exalgo that needed to be addressed included that "it can be tampered with, and potentially fatal?" and "it is not tamper-resistant, when newer medications have tamper resistant features?"[30]  Similarly, in May 2010, a regional sales director forwarded an email from a sales representative on to the product director for specialty pharmaceuticals, stating that physicians were "surprised and disappointed that Exalgo did not have any kind of tamper proof properties to the product.  They felt like the FDA as well as Covidien would have made that a requirement with this product."[31]

---

[26] *Id.* ¶55.
[27] *Id.* ¶ 56.
[28] *Id.* ¶57.
[29] *Id.* ¶ 208.
[30] Amended Complaint ¶59.
[31] *Id.* ¶ 60.

While sales personnel discussed the fact that the DEA was making visits to opioid distributors, that the visits were seen as "warnings" and that Mallinckrodt could not "afford to be on the wrong side of the DEA,"[32] increasing sales of Exalgo remained the primary focus of the pharmaceutical segment.

A December 2010 meeting summary regarding Exalgo notes how the company was successfully pushing higher doses than the FDA-approved labels for Exalgo permitted. The summary noted that: "Doctors [were] complaining that patients [were] having withdrawals and problems when only using once a day, so doctors are using 2x a day, and patients loved it."[33]

Sales representatives received training on how to overcome prescribers' concerns about patient abuse of the company's opioids, patient safety, or legal and regulatory scrutiny. When representatives reported that prescribers objected to Exalgo because it was "just as addicting as Dilaudid," was perceived as a desirable street drug, and that prescribers were "very concerned with abuse potential," sales representatives were encouraged to push back on those beliefs and convince providers that "Exalgo is NOT a big gun and should be used sooner" in a patient's treatment process.[34] In July 2010, one sales representative reported on the success of the relentless and high-pressure sales tactics, relaying that a prescriber told him "he is using …[Exalgo] because I am constantly in his office."[35]

With Purdue under scrutiny, one of the pharmaceutical division's tactics to drive Exalgo growth was to get patients to switch from Purdue's OxyContin product to Mallinckrodt's Exalgo, which was a higher dose. In December 2010, Covidien's district sales manager for specialty pharmaceuticals encouraged aggressive Exalgo sales, stating in an email to his sales team that

---

[32] *Id.* ¶ 131.
[33] Amended Complaint ¶ 52.
[34] *Id.* ¶¶ 49-50.
[35] *Id.* ¶ 44

we are losing some momentum and need to follow up with our providers that have
committed to prescribing Exalgo.  Let's not forget to focus on the OxyContin
failures or patients that are complaining of the adverse events, especially in light
of the fact that the scripts for OxyContin grew by roughly 1400 patients from the
previous week.[36]

## Opioid Abuse and Product Diversion

With incidents of opioid abuse and misuse continuing to rise, diversion of opioids

became the focus of regulatory officials.  In accordance with the Controlled Substances Act,

analogous state laws, and DEA regulations, Mallinckrodt, as a registered manufacturer of

controlled substances, was required to design and implement a suspicious order monitoring

system (the "**Monitoring System**") for the purpose of detecting orders that were most likely to

lead to diversion of its products to the black market to be sold for recreational use and abuse.

These laws required the company to (a) establish a system designed to detect and investigate

suspicious orders of opioids, which were "orders of unusual size, orders deviating substantially

from a normal pattern, and orders of unusual frequency;" (b) refuse to fill suspicious orders; (c)

only fill orders flagged as suspicious if, after conducting due diligence, it could determine that

such orders were likely not diverted; and (d) report all suspicious orders to the DEA and certain

state agencies.[37]  But the Monitoring System Mallinckrodt had in place failed to meet these

requirements in several respects.

First, the system itself was insufficient and easily manipulated.  According to a former

employee, the algorithm that Mallinckrodt used to identify suspicious orders had gaps that made

it possible for problematic orders to get through.[38]  Even so, when the monitoring team was

flooded with more suspicious orders than it could review, Mallinckrodt simply changed the

algorithm so that instead of flagging orders that were twice as large as average, it only flagged

---

[36] *Id.* ¶41.
[37] Amended Complaint ¶ 99-100.
[38] *Id.* ¶ 112.

orders that were three times as large as average so there would be fewer reports for the team to review.[39]

Second, even when the monitoring team did detect suspicious orders, employees did nothing to stop them.  Between 2003 and 2011, though more than 37,000 orders were flagged as potentially suspicious, Mallinckrodt appears to have stopped and reported only 33 orders.[40]  As far back as 2008, when Mallinckrodt informed the DEA that it was filling orders that were suspicious, the DEA division supervisor asked why the company was filling suspicious orders and stated: "If you think it is suspicious[,] don't fill it."[41]

Internal documents demonstrate that suspicious orders were cleared and filled not because it had been determined that they would not be diverted, but in order to keep "momentum rolling" with a customer or allow the customer to secure favorable pricing.[42]  In some instances Mallinckrodt would halt shipments of opioids to problematic customers only to resume them a few weeks later,[43] or continue shipping to customers that had been listed as "blocked" in its system.[44]  Though Mallinckrodt claims to have blocked over sixty pharmacies from receiving shipments in 2011, it was only able to locate four such letters to pharmacies from that year.[45]

When Mallinckrodt employees became aware that one of its Florida customers, Sunrise Wholesale, might be involved in the diversion of its products, the company continued to ship products to Sunrise, even as the DEA began investigating whether Sunrise was supplying opioids to pill mills.[46]  When Sunrise and another of Mallinckrodt's Florida customers had their licenses

---

[39] *Id.* ¶ 118.
[40] *Id.* ¶ 113.
[41] Amended Complaint ¶ 113.
[42] *Id.* ¶ 115.
[43] *Id.* ¶ 128.
[44] Amended Complaint ¶ 128.
[45] *Id.* ¶ 128.
[46] *Id.* ¶ 121-123.

suspended, a product manager for Mallinckrodt expressed concern only about how that might affect the bottom line, noting that with the volume of opioids going through Florida, "[i]f the state of Florida were to right-size, this has huge financial implications." Covidien's vice president of strategy and portfolio management responded to this email with an instruction to "limit email discussion" of the topic.[47]

Mallinckrodt gave its sales force the authority to both investigate suspicious orders and clear them, despite the fact that the compensation scheme for such employees favored sales over compliance.[48] Mallinckrodt was warned against using sales representatives to carry out its compliance functions. According to meeting notes taken by a Mallinckrodt employee from a DEA pharmaceutical conference in October 2008, the "general consensus is that sales reps are not considered a good option for on-site investigations and initial review prior to accepting new customers due to their perceived bias in getting the customer approved for sales revenue purposes."

As the crisis grew in notoriety, Mallinckrodt gave its representatives media training on how to address "real worst-case scenarios," including how to "play [] devil's advocate around opioid abuse/misuse/diversion" and "gracefully extract or bridge out of an interview that could be potentially damaging to the company."[49]

**Covidien Explores Options for Divesting the Opioid Business**

By 2011, the opioid crisis had reached the boiling point. Following Purdue Pharma's release of an abuse-deterrent form of its OxyContin product, there was an increasing demand for high-dose pure oxycodone. A Mallinckrodt employee circulated an article describing this increased demand, commenting "I think it supports our suspicions in regard to the increased

---

[47] *Id.* ¶ 126.
[48] *Id.* ¶¶ 114-15.
[49] Amended Complaint ¶ 226.

usage of the Oxy 30mg." These suspicions were confirmed when Mallinckrodt was informed by the Department of Justice ("**DOJ**") that its 30 mg generic oxycodone tablets had replaced the old formulation of OxyContin as the main illicit drug on the streets in New England.[50] By spring of that year, the opioid crisis had become a much greater focus of Covidien's attention, with at least eight settlements between its competitors or distributors and the government on record, totaling approximately $750 million.[51]

Though discussions initially began in late 2010, by mid- 2011 Covidien was exploring potential strategic options for Mallinckrodt in earnest.[52] Covidien initially looked at selling Mallinckrodt, with Covidien's board recommending the company "pursu[e] 5 strategic buyers who would not require an audit, financing and would not dig."[53] But it made little headway in its attempts to find a buyer due, at least in part, to issues surrounding how to treat contingent and disputed opioid related liabilities.

In March 2011, Covidien's board noted that it would only approve sales to a prospective buyers if "they assume liabilities."[54] In April 2011, a group chief financial officer for Covidien emailed Covidien's assistant treasurer stating that he wanted to speak about a prospective purchaser of Mallinckrodt. The treasurer replied, "Ok, expecting their offer, if any, on the 11th[,] to which the CFO responded "If any???[,]" which prompted the treasurer to reply "Not putting it in an email."[55]

One prospective purchaser seemed concerned about the opioid-heavy nature of Mallinckrodt's business, noting that Exalgo used hydromorphone, which is "the most potent oral

---

[50] *Id.* ¶ 129.
[51] *Id.* ¶ 198.
[52] *Id.* ¶¶ 248-249.
[53] *Id.* ¶ 249.
[54] Amended Complaint ¶ 249.
[55] *Id.*

opiate."  The prospective purchaser asked how Exalgo made it to market when a similar product

by Purdue was taken off the market due to its fatal interaction with alcohol.[56]  This buyer made

an offer of $4 billion for Mallinckrodt, but refused to assume any liabilities with the sale,

including opioid liabilities.  Although Mallinckrodt's assets were only worth about $3.3 billion at

the time, Covidien rejected the offer.[57]  While Covidien had received one other bid, it was later

withdrawn.  The potential buyer informed Covidien that it was no longer interested in pursuing

the sale, citing "treatment of contingent liabilities" and "value expectations" as some of its

reasons.[58]

    In April 2011, the executive committee of Covidien's board received a presentation that

laid out significant concerns and deficiencies with the company's Monitoring System.  The

presentation noted that the DEA had suspended licenses and issued fines against distributors for

their failure to maintain effective controls against diversion of controlled substances.  The

presentation concluded that the Monitoring System that Mallinckrodt had in place before June

2010 "was not comprehensive enough to meet emerging guidance from [the] DEA" and warned

that "Mallinckrodt is viewed as the kingpin within the drug cartel."[59]  Indeed, in her April 23,

2011, notes from a DEA conference, a Covidien compliance officer noted that a DEA

representative said. "I am coming.  You don't want me.  I can 'tear you apart.'  If [the] DEA can

see where the drugs are going, Mallinckrodt knows full well where the drugs are going."[60]

    A few days after the April presentation to Covidien's board, Covidien's general counsel

emailed his staff that "there is a growing sense of concern" at the executive committee level

about controlled substance sales to Florida.  He continued:

---

[56] *Id.* ¶ 251.
[57] *Id.* ¶ 252.
[58] Amended Complaint ¶ 253.
[59] *Id.* ¶ 205.
[60] *Id.* ¶ 236.

> Even though we say – and believe – that we are complying with our legal obligations . . . the . . . [executive committee] wonders what our exposure is and whether there are other things we should be doing.[61]

On May 13, 2011, Covidien's vice president of communications for the pharmaceuticals business received an internal report stating that "a number of media outlets . . . are . . researching stories on pill-mills, and their research trail will likely lead them back to us at some point."[62] Communications employees noted that they were putting together a "tactical package" in response to potential media inquiries about Covidien's pharmaceutical business.[63]

That same month, Covidien told its employees not to send information about the suspicious order monitoring system and pill mills in emails, warning employees against putting "complex thoughts" in writing and encouraging them to have conversations instead.[64]  When the topic of discussion pertained to opioids, Covidien urged its employees to "have a meeting . . . or call" rather than putting their thoughts into emails.  When opioid related issues did have to be in writing, Covidien instructed employees to include or copy an in-house lawyer on the communications.  Additionally, certain documents addressing legal or regulatory issues were delivered to personnel in printed form rather than transmitted by email.[65]

A few months later, in September 2011, Covidien issued a formal litigation hold to employees, mandating that documents be preserved in response to emerging investigations by both the DEA and the U.S. Attorney's Office in Detroit regarding the company's failure to report suspicious orders.[66]

---

[61] *Id.* ¶ 206.
[62] *Id.* ¶ 210.
[63] Amended Complaint ¶ 206.
[64] *Id.* ¶ 245.
[65] *Id.* ¶ 246.
[66] *Id.* ¶¶ 189, 238.

On November 1, 2011, the Centers for Disease Control and Prevention declared an "opioid epidemic," noting that "the death toll from overdoses of prescription painkillers has more than tripled in the past decade."[67]

On November 30, 2011, the DEA subpoenaed Mallinckrodt for documents related to its Monitoring Program (the "**2011 DEA Subpoena**")[68]

On December 15, 2011, Covidien announced its plans to spin off its pharmaceutical segment into a standalone public company.[69]

By 2012, the company was under intense scrutiny in the media.  In June 2012, *Bloomberg Business Week* published an article titled "American Pain: The Largest U.S. Pill Mill's Rise and Fall." The article stated that the most common form of "roxy" was little blue pills customers called "mallies" because they were made by "Mallinckrodt . . . the pharmaceuticals business of Dublin-based Covidien," which customers liked the most because they were the easiest to crush up, mix with water, and inject.[70]

Yet, with the Spinoff in mind, increasing sales of opioid products became more important than ever.  A draft letter from Covidien's vice president of general management/marketing made clear that increased Exalgo sales would be the key to spinoff success, stating:

> Finally, remember EXALGO is the focus! We have a tremendous opportunity to drive commercial success this year and truly position for the launch of the 32mg dose for those patients requiring continuous opioid therapy in a true once-daily medication.  With the upcoming spin-off, the spotlight is on us now more than ever to deliver on our brand, as well as organizational and financial commitments. Our focus is  on creating a compelling story for customers

---

[67] Amended Complaint ¶ 197.
[68] *Id.* ¶ 239.
[69] *Id.* ¶ 240.
[70] *Id.* ¶ 200.

> and investors alike— EXALGO is the brand that will help us
> realize our goals.[71]

Covidien's VP of communications for the pharmaceutical business received updates from a media affairs company summarizing all news articles from June 18 through June 22, 2012, returned using the search terms "painkiller abuse," "painkiller misuse," and "prescription drug abuse." There were over forty articles from that five-day period. One article stated that "[t]he most dangerous drug dealers in the world . . . are wearing suits and ties in the boardrooms of America." It added that "[t]he nonmedical use of prescription opiates is the fastest growing drug abuse problem in the United States."[72] A July 21, 2012, article warned that "[p]oison control centers are increasingly dealing with young children who have accidentally ingested powerful painkillers . . . a phenomenon associated with adult abuse of opiate-based prescription drugs."[73]

Yet just days later, on July 25, 2012, Covidien's VP and general manager of specialty pharmaceuticals asked the sales team to "really turn up the volume on EXALGO this quarter and hyper-focus on making an impact on your top targets[,]" noting that it was the sales team's "last chance to make a run at the FY12 President's Club trip in Mexico," a trip for high-achieving sales people.[74] In August 2012, a regional sales director wrote that Exalgo was the "number 1 priority" of the pharmaceutical business and that performance evaluations would be based "almost exclusively . . . [on] Exalgo performance," further noting that representatives should "make sure… [they] are driving Exalgo every day" and "on every single sales call."[75]

In addition to striving to get as many new patients as possible, the company also worked to ensure that patients who had been prescribed Exalgo would stay on the drug and take

---

[71] *Id.* ¶ 262.
[72] Amended Complaint ¶ 213.
[73] *Id.* ¶ 213.
[74] *Id.* ¶ 214.
[75] Amended Complaint ¶ 43.

increasingly higher doses.  Sales representatives were applauded for suggesting tactics to prescribers that would allow them to override insurance quantity limits on opioids so that larger quantities of pills could be prescribed.[76]

Mallinckrodt instructed its sales representatives to focus their efforts on physicians who had been frequent prescribers of opioids in the past and would continue working with prescribers even after they were suspected of diverting narcotics to the black market.  For example, in February 2012, a district business manager, noting Mallinckrodt's low market share in areas with significant numbers of "Opana ER [a competitor opioid] pill mills," stated that he "heard the pill mills are switching patients to Oxycodone," and expressed that "we have to find some business with the current opportunity."[77]

Records kept by sales representatives often included concerning notes demonstrating their knowledge of the prescribers' improper practices, including comments regarding prescribers being investigated by the DEA, accepting cash, and making inappropriate statements like "his patients deserve to be high."  After a manager shared a success story in March 2012 about a sales representative successfully switching a prescriber whose patients came in bi-weekly for refills, another sales representative commented "they come in bi-weekly for Lortab refills? … Can you say Pill Mill? I am not sure I would have published this."[78]

When one sales representative informed his district manager that his primary target for OxyContin was recently arrested and his office shut down due to improper prescribing habits, the district manager simply stated that Mallinckrodt was "running into many issues in the field where Reps don't have viable targets" due to opioid prescribers losing their licenses, and

---

[76] *Id.* ¶ 51.
[77] *Id.* ¶¶ 68-71.
[78] *Id.* ¶ 72.

expressed concern about how this was impacting the sales representatives' ability to meet their quotas.[79]

The company's sales and marketing efforts included funding "front groups" that developed educational materials and treatment guidelines encouraging the widespread prescription of opioids for a variety of conditions.  For example, Covidien founded and funded an advocacy organization called the CARES Alliance (CARES stood for Collaborating and Acting Responsibly to Ensure Safety), whose stated goal was to "promote safe prescribing, dispensing, use, storage, and disposal" of opioid medication.  The CARES Alliance distributed free books and fact sheets for prescribers that contained false and misleading information regarding opioid use and addiction and used these materials to help assuage prescriber discomfort with opioids and increase their total opioid prescriptions.  Covidien monitored the actions that the CARES Alliance took in furtherance of its stated goals through monthly pharmaceutical reports.[80]  The materials published and disseminated by the CARES Alliance downplayed the relevance and risk of opioid addiction and instead promoted false and misleading concepts like "pseudoaddiction."[81]

In January 2013, Covidien's legal department drafted a memorandum regarding opioid abuse entitled "The Big Picture."  It compiled federal statements on opioid abuse and deaths from as far back as 2009, discussed the changing regulatory environment, and noted "core issues" of opioid abuse, including "inappropriate prescribing," high volume and public availability of prescription opioids, the low cost for generic prescription opioids, "diversion," and "lack of redundant checks and balances from drug manufacturer to patients."[82]

---

[79] Amended Complaint ¶ 73.
[80] Id. ¶ 93
[81] Id. ¶¶ 93-97.
[82] Id. ¶ 229.

Nevertheless, the company put consistent pressure on sales representatives to sell more opioids, and underperforming representatives felt the threat of termination.  In February 2013, when sales representatives failed to secure sufficiently high numbers of Exalgo free-trial redemptions, a district manager wrote, "YOU ARE MAKING ME LOOK BAD.  Why can't we get our speakers to use them?  Why won't our current customer[s] use them or simply do you a favor?  You can find a way to get them to use them or pick up the phone and tell me what the [f—k] is going on because I'm lost."[83]   In an April 2013 email, a regional sales director wrote to his sales representatives that "expectations are escalating.  We can't afford to carry unprofitable weight, and the organization won't let us."[84]

As the sales force worked to increase opioid sales, the subpoenas kept coming.  By April 2013, the company received three more subpoenas since the one it received in 2011, including one from the City of Chicago and two more from the DEA.[85]

On May 13, 2013, the National Association of Attorneys General sent a letter signed by the attorneys general of forty-three states to the FDA, expressing concern about the opioid epidemic and specifically babies born with Neonatal Abstinence Syndrome ("**NAS**").  The letter requested that the FDA include a warning label on opioid products advising that the use of opioids when pregnant may cause NAS.[86]  In support, the attorneys general cited a 2012 study showing that, in 2009 alone, the cost of treating NAS was over $720 million and that, in the United States, a baby with NAS was born approximately every hour.[87]  Mallinckrodt, however, opposed warning labels about NAS on its products.

---

[83] Amended Complaint ¶ 45.
[84] *Id.*
[85] *Id.* ¶¶ 180, 241-43.
[86] *Id.* ¶ 203.
[87] *Id.* ¶ 203.

**The Spinoff**

By 2013, the lengthy and complex process of disentangling Mallinckrodt from the Covidien enterprise to effectuate the Spinoff was well underway.  In addition to undertaking the many transactions required to separate the pharmaceutical business from the non-pharmaceutical business, Covidien also took a series of steps that had the effect of increasing the burdens on the newly independent Mallinckrodt.

In the three years preceding the Spinoff, Covidien caused Mallinckrodt to make a series of cash transfers which totaled $867 million (the "**Cash Transfers**").[88]  Covidien also caused its pharmaceutical business to incur a substantial amount of debt and to transfer most of the funds from its debt offerings to Covidien.  Specifically, Covidien caused MIFSA to issue approximately $300 million of 3.50% senior unsecured notes due in 2018 and approximately $600 million of 4.75% senior unsecured notes due in 2023 (the "**Note Issuance**"), but approximately $721 million of the $900 million total note proceeds (the "**Note Proceeds**") went to Covidien.  Additionally, MIFSA was required to pay the $11 million in fees incurred in connection with the Note Issuance out of its share of the Note Proceeds.[89]

In connection with the Spinoff, Mallinckrodt also assumed significant portions of Covidien's tax liability.  As a part of the Covidien enterprise, Mallinckrodt had been covered by, but not a party to, a tax sharing agreement among Covidien plc, Tyco, and TE Connectivity Ltd. (the "**Tyco Tax Agreement**") for U.S. income tax liabilities arising prior to Tyco's 2007 spinoff of Covidien (the "**Pre-2007 Tax Liabilities**").[90]  In connection with the Spinoff, on June 28, 2013, Covidien and Mallinckrodt plc executed a new tax agreement (the "**Tax Matters Agreement**.").  Under this agreement, Covidien shifted part of its Pre-2007 Tax Liabilities,

---

[88] Amended Complaint ¶ 254.
[89] Id. ¶ 273.
[90] Id. ¶ 275.

estimated in the hundreds of millions of dollars (the "**Tax Liability**") to Mallinckrodt but
retained the receivables from Tyco and all reimbursements received from Tyco under the Tyco
Tax Agreement, including reimbursements borne by Mallinckrodt pursuant to the new Tax
Matters Agreement.[91]

The Tax Matters Agreement not only shifted significant tax liabilities to Mallinckrodt,
but it also mandated that Mallinckrodt take certain actions to restrict the size of its business for
two years post-spin and obtain approval from Covidien to take other actions, such as launching
new products.[92]

The terms of the Spinoff were set forth in a Separation and Distribution Agreement
between Covidien plc and Mallinckrodt plc (the "**Separation Agreement**").  Pursuant to this
agreement, Mallinckrodt plc assumed all liabilities stemming from the operation and ownership
of the pharmaceutical business, as well as substantial liabilities relating to Covidien's legacy
indebtedness.[93]  The Separation Agreement provided that Mallinckrodt would indemnify
Covidien for any liabilities arising out of the pharmaceutical business, regardless of whether the
acts that gave rise to the liability occurred before or after the Spinoff.[94]

Prior to the Spinoff, Covidien had hired a leadership team for the newly independent
entity, selecting a CEO and appointing directors to serve on Mallinckrodt's board.  However,
Covidien prohibited the new board from making any decisions before the Spinoff was complete.
In June 2012, Covidien sent letters to all the nominees for the future board of directors of the
spun off Mallinckrodt entity.  The letters stated that "full control of the operations of the
Pharmaceuticals business and all decisions around the spin-off, including the constitution of the

---

[91] Amended Complaint ¶ 276.
[92] *Id.* ¶ 278.
[93] *Id.* ¶ 279.
[94] *Id.* ¶¶ 279-281.

Spinco board of directors, are and remain the sole responsibility of the Covidien board of directors prior to the spin date."  The letters also stated that "It is our mutual understanding that full control of the operation of Mallinckrodt remains with the Board of Directors of Covidien until the distribution, and that neither you nor any other prospective director of Mallinckrodt has any duty, fiduciary or otherwise, to Covidien or Mallinckrodt . . . unless and until you formally become a director of Mallinckrodt. . . ."[95]

Mallinckrodt's newly appointed leadership team had concerns about certain aspects of the transaction.  As the Tax Matters Agreement was being drafted, Mallinckrodt's Vice President of Global Tax reported "I am troubled by a provision in the latest draft of the TMA . . . . This provision could easily tie our hands for 5 to 10 years, maybe more, with potentially 7 or 8 figure consequences."[96]  Similarly, Matthew Harbaugh, the future CFO of Mallinckrodt, expressed concern about the amount of debt that Covidien was putting onto Mallinckrodt, stating, "Covidien is providing us with $150M in cash against $900M in debt with net debt at $750M. . . . We need to get the $900M down further and keep the $150M in a perfect world.  Hopefully our soon to be officially added Board members can influence accordingly. . . ."[97]  But the new board was not given an opportunity to negotiate better terms for Mallinckrodt.

On June 29, 2012, Mallinckrodt board nominee Paul Clark emailed Covidien's General Counsel, Peter Edwards, noting that the director-nominee letter agreement did not permit "SpinCo" to have its own legal counsel.  Clark continued:

> "We would like to begin to work with counsel . . . . We would direct them to work collaboratively with Wachtell.  We suggest you ask Wachtell their opinion on Mallinckrodt having separate counsel. . . . We would not expect you to grant approval in a vacuum.  As such you can veto any firm that Wachtell believes would be adversarial and difficult to work with.

---

[95] Amended Complaint ¶ 168.
[96] *Id.* ¶ 278
[97] *Id.* ¶ 274.

Edwards responded that the Mallinckrodt board should not raise the legal counsel issue with Covidien yet because he thought others at Covidien would view it as highly confrontational.[98] Mallinckrodt was never granted separate counsel.

Despite "SpinCo" not having the benefits of separate legal counsel, Covidien informed the SEC that the spinoff was the result of an "arms-length" negotiation between Covidien and Mallinckrodt.  The SEC determined that this representation was false and asked Covidien to withdraw this claim.  In a letter dated March 15, 2013, Covidien agreed to do so.[99]

The disentanglement of the business segments took nearly two years, involved roughly 200 steps, and cost Covidien approximately $235 million to accomplish.  By the end of this process, the Covidien enterprise had been restructured into two distinct lines of entities under its ultimate parent company:  one that held all non-pharmaceutical assets and would remain with Covidien and one that held all the pharmaceutical assets and would be spun off as Mallinckrodt.[100]  In the final steps of the transaction, MIFSA redeemed its shares from Covidien plc in exchange for cash (specifically, $721 million from the Note Proceeds) and Covidien caused MIFSA to be transferred to Mallinckrodt plc, thus completing the Spinoff.  The Spinoff closed on June 28, 2013.[101]

**The Bankruptcy**

Following the Spinoff, Mallinckrodt operated as a standalone entity with some success for several years.  But by 2020, the "all-consuming tidal wave of litigation" that Mallinckrodt faced -- consisting of more than 3000 lawsuits arising out of the manufacture and sale of its

---

[98] *Id.* ¶ 169.
[99] Amended Complaint ¶ 170.
[100] *Id.* ¶ 271.
[101] *Id.*

opioid products – overtook the company.[102]  On October 12, 2020 (the "**Petition Date**"), Mallinckrodt filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "**Code**").

A majority of the opioid-related lawsuits filed against Mallinckrodt asserted two theories of liability.  First, plaintiffs alleged that Mallinckrodt engaged in misleading marketing that overstated the benefits of opioid products and understated their risks.  Plaintiffs claimed that Mallinckrodt's marketing caused healthcare providers to prescribe opioids inappropriately, increasing addiction, misuse, and abuse.  Second, plaintiffs alleged that Mallinckrodt did not comply with suspicious order monitoring obligations under federal and state law.  As a result, Mallinckrodt flooded the market with opioids, increasing diversion of opioid products and thus increasing addiction, misuse, and abuse.[103]

Upon Mallinckrodt's emergence from bankruptcy, the Trust was formed for the benefit of the individuals and entities that hold claims against Mallinckrodt arising out of its manufacture and sale of opioids.

On October 11, 2022, the Trust commenced this adversary proceeding.


## **JURISDICTION**

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

---

[102] D.I. 128, Declaration in Support of Chapter 11 Petitions, ¶ 76.  Reorganized Debtor Mallinckrodt plc and 60 of its affiliates filed for bankruptcy a second time in this Court in 2023.  See Case Number 23-11258.
[103] Amended Complaint ¶ 289.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) serves to test the sufficiency of the complaint, and a court's role is to determine whether the plaintiff is entitled to offer evidence in support of its claims. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000); *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)). To survive a motion to dismiss, a plaintiff must allege well-pleaded facts with sufficient detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Third Circuit has adopted a two-part analysis that courts must employ when deciding a motion to dismiss for failure to state a claim. *Fowler*, 578 F.3d at 210. "First, the factual and legal elements of a claim should be separated" with the reviewing court accepting "all of the complaint's well-pleaded facts as true, but . . . disregard[ing] any legal conclusions." *Id*. at 210-11. Next, the reviewing court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679); *Gellert v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*, Nos. 09-11582 & 11-53885, 2012 WL 5360945, at *3 (Bankr. D. Del. Oct. 31, 2012). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more  than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 679. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED.

R. Civ. P. 8(a)(2)).  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**ANALYSIS**

## I.      Securities Safe Harbor

Covidien asserts that Counts I and II of the Amended Complaint, which seek to avoid Mallinckrodt's payment of $721 million of the Note Proceeds and the transfer of certain non-pharmaceutical assets ("**Non-Pharma Assets**") to Covidien in exchange for MIFSA's shares, are barred under Section 546(e) of the Code, known as the securities safe harbor provision.  In relevant part, Section 546(e) provides that:

> Notwithstanding section [] 544. . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial participant, . . . or that is a transfer made by or to (or for the benefit of) a . . . financial participant . . . in connection with a securities contract . . . .

11 U.S.C. § 546(e).  In simpler terms, the safe harbor provision applies when "(1) there is a *qualifying transaction* (*i.e.*, there is a 'settlement payment' or a transfer payment . . . made in connection with a securities contract), and (2) there is a *qualifying participant* (*i.e.*, the transfer was made 'by or to (or for the benefit of) a . . . financial institution, [or financial participant]')." *In re Quorum Health Corp.*, No. 20-10766, 2023 WL 2552399, at *5 (Bankr. D. Del. 2023 Mar. 16, 2023) (quoting *SunEdison Litig. Tr. v. Seller Note, LLC (In re SunEdison, Inc.)*, 620 B.R. 505, 513 (Bankr. S.D.N.Y. 2020)) (alterations in original).

Covidien argues that (1) the spinoff is a qualifying transaction because it may be appropriately characterized as either a settlement payment or a transfer made in connection with a securities contract; and (2) Covidien and MIFSA are "financial participants" within the meaning of the statute.[104] The Trust argues that Covidien's reliance on the safe harbor is

---

[104] *See* Opening Br. at 29-30.

misplaced for several reasons. First, the Trust argues that because the Spinoff involved more than just the transfer of securities and settlement payments, the transaction is not a qualifying transaction. Second, the Trust argues that Covidien cannot establish at this stage of the proceedings that it, or any other party to the Spinoff, is a financial participant as defined in the Code.

Generally, determinations under Section 546(e) require fact-intensive determinations that are not appropriate for resolution at the motion to dismiss stage. *In re Centaur, LLC*, No. 10-10799, 2013 WL 4479074 at *4 (Bankr. D. Del. Aug. 19, 2013); *see also Zazzali v. AFA Fin. Grp., LLC*, No. 10-54524, 2012 WL 4903593 at *11 (Bankr. D. Del. Aug. 28, 2012) ("[I]t is premature to dismiss this count on the basis of the 546(e) defense. The application of the defense is a fact-based inquiry.") (citing *Brandt v. B.A. Capital Co. LP* (*In re Plassein Int'l Corp.*), 366 B.R. 318, 323-25 (Bankr. D. Del. 2007), *aff'd*, 590 F.3d 252, 254-56 (3d Cir. 2009)). Accordingly, at the motion to dismiss stage, courts in this district will consider an affirmative defense based on the safe harbor provision only "where the defense is clearly established on the face of the complaint." *Zazzali*, 2012 WL 4903593 at *11; *see also In re DBSI, Inc.*, 477 B.R. 504, 515 (Bankr. D. Del. 2012); *Brandt*, 366 B.R. at 323-25. As discussed below, the elements of the Section 546(e) safe harbor defense are not immediately apparent from the face of the complaint.

A.     Is There a Qualifying Transaction?

The Trust argues that because the Spinoff was implemented through a "complex series of more than 200 individual steps" the Court cannot look at just a single transfer but must look at the overarching transaction that included "formations, contributions, distributions, sales,

liquidations, redemptions, dividends and transfers."[105] The Trust relies on *Merit Management Group., LP v. FTI Consulting, Inc.,* 138 S. Ct. 883, 888, 897 (2018) and *In re Mervyn's Holdings, LLC,* 426 B.R. 488 (Bankr. D. Del. 2010) for the proposition that the Spinoff was more than a mere securities trade in which a settlement payment was made, which means it cannot constitute as a qualifying transaction for purposes of the safe harbor.

Covidien counters that the Supreme Court's decision in *Merit Management* supports the view that the safe harbor inquiry should focus on the "transfer that the trustee seeks to avoid" rather than the component parts of the transaction.[106]  Moreover, the *Mervyn's* decision, Covidien argues, merely held that a challenged transfer of real estate, not securities, did not fall within the safe harbor, even if a separate transfer in a broader transaction might have.  In Covidien's view, because it is seeking to apply the safe harbor only to the transfer of the Note Proceeds and the Non-Pharma Assets in exchange for securities, the safe harbor applies.

I agree with Covidien's view of the scope of the safe harbor.  The transfer of the Note Proceeds and the Non-Pharma Assets in exchange for MIFSA's shares constitutes a settlement payment under Section 546(e) of the Code.  *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999) (discussing the Code's "extremely broad" definition of settlement payment and stating that "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction").  It also constitutes a transfer made in connection with a securities contract, namely the Separation Agreement.  See 11 U.S.C. § 741(7)(A)(i) (defining "securities contract" as "a contract for the purchase, sale, or loan of a security. . . including any repurchase. . . on any such security");  Separation Agreement, D.I. 16 , Ex. 8, ¶ 2.15(b) ("On or prior to the Distribution Date, MIFSA

---

[105] Opposition Br. at 36.
[106] Reply Br. at 19.

shall redeem a portion of its equity interest for an amount in cash that equals (i) $889.3 million (which represents the net proceeds of the Senior Notes Offering), plus (ii) Covidien's estimate as of the time of such redemption of (x) the amount of Mallinckrodt Cash and (y) the amount drawn under the Mallinckrodt Line of Credit, in each case as of a then-recent date and without duplication, less (iii) $168 million.").  The question remains whether either Covidien or MISFA qualify as a "financial participant" in order to meet the second requirement of the safe harbor.

B.    Is Any Party to the Spinoff a Financial Participant?

The second requirement for application of the safe harbor is that the transfer was made for or by (or for the benefit of) a qualifying financial participant. A qualifying financial participant is defined in the Code as:

> (A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) [11 USCS § 561(a)] with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition

11 U.S.C. § 101(22A) (alterations in original).

Covidien asserts that both it and MISFA qualify as financial participants. In support of this position, Covidien points first to the Separation Agreement, the document that governs the very transaction the Trust seeks to unwind. Covidien's argument is misplaced.  The Separation Agreement does not fit either one of the requirements of Section 101(22A).

First, the plain language of Section 101(22A) provides that to be considered a financial participant the entity must already be a financial participant "at the time it enters into" the

30

relevant agreement.  11 U.S.C. § 101(22A).  This language makes clear an entity cannot rely on the agreement it is entering into to establish that as of the date of entering into that agreement it is a market participant.  *See Hardt v. Reliance Standard Life Insurance Co.*, 560 U.S. 242, 251, 130 S. Ct. 2149, 2156 (2010) ("[Courts] must enforce plain and unambiguous statutory language according to its terms.").  Accordingly, the Separation Agreement cannot be used to establish that either Covidien or MISFA was a financial participant.  Second, because the Separation Agreement was executed in 2013, more than seven years prior to the Debtors' Petition Date in 2020, it also cannot be used to establish that Covidien or MIFSA was a financial participant during the fifteen-month period preceding the Petition Date.

Covidien asserts that even if the Separation Agreement does not qualify it as a financial participant, it can rely on two additional agreements it claims existed at the time of the Spinoff.  One, a swap agreement it contends had a notional principal value of $1.2 billion, and two, a debt-securities contract valued at $750 million.  These agreements are not mentioned in the Trust's complaint, and Covidien relies instead on its SEC filings in an attempt to establish the existence and the value of these agreements.  In doing so, Covidien relies on *NACH, Inc. Securities Litigation*, 306 F.3d 1314 (3d Cir. 2002), and *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) for the proposition that, on a motion to dismiss, the Court can take judicial notice of the existence and value of agreements mentioned in a party's SEC filings. Covidien's reliance on those decisions is misplaced.

Both *NACH* and *Oran* involved allegations of securities fraud arising out of alleged misrepresentations made in the defendants' SEC filings.  Both decisions conclude, however, that while the SEC filings may be considered on a motion to dismiss to show that certain statements were made in those filings, they cannot be considered for the truth of those statements. *NACH*,

306 F.3d at 1331 ("the underlying documents should be considered for their contents rather than

for the truth of the contained statements"); *Oran*, 226 F.3d at 289 ("[T]he documents are the very

documents alleged to contain the various misrepresentations or omissions and are relevant not to

prove the truth of their contents but only to determine what the documents stated."). *See also*

*Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.)*, 197 F. Supp. 2d

42, 53-54 (D. Del. 2002) ("[A] court may consider SEC filings for the purpose of determining

what statements the documents actually contain. However, the documents may not be considered

to establish the truth of the matters asserted in them.").

In this matter, Covidien does not ask that I take judicial notice of the existence of the

statements in the SEC filings, but that I also assume that the statements within the filings are

true. That is, Covidien asks that I apply the safe harbor defense because the disclosures prove the

truth that it is a qualified financial participant based on the transactions described in its SEC

filings. Because I cannot do so at this stage of the proceedings, Covidien's Motion to Dismiss

based on the safe harbor defense is denied.[107]

## II.    **Actual Fraudulent Transfer**

### A.  Applicable Law

The Trust seeks to avoid the transfers made in connection with the Spinoff as actually

fraudulent in four separate counts of the Amended Complaint, each one based on a different

portion of the transaction:  Count I (the Spinoff), Count III (the Indemnity Obligations), Count V

---

[107] Covidien also argues that MISFA qualifies as a financial participant because it was a party to the
Separation Agreement thus meeting the $100 million mark-to-market test. In addition, Covidien asserts
that because MISFA was also a party to the debt-securities contract entered into in connection with the
Spinoff with a face value of $900 million, that agreement in combination with the Separation Agreement
meets the $1 billion face amount test. Because I have already concluded that Covidien cannot rely on the
Separation Agreement to establish financial participant status, Covidien's Motion to Dismiss based on
MISFA's financial participant status is also denied. I do not, therefore, need to address the Trust's
arguments that MISFA, as a debtor, cannot qualify as a financial participant under the Code.

(Tax Liability), and Count VII (Cash Transfers) (collectively the "**Actual Fraud Counts**").  The Trust describes these claims as being made pursuant to the "Uniform Fraudulent Transfer Act or other applicable law."[108]  It is clear from the parties' briefing and argument that the three potentially applicable laws are: Delaware (6 Del. Code § 1301), Massachusetts (109A Mass. Gen. Laws Ann. § 1), or Missouri (Mo. Ann. Stat. § 428.005).  As the provisions of each are largely the same,[109] I will, for ease of reference, refer simply to the Uniform Fraudulent Transfer Act ("**UFTA**") as the applicable law.

The Trust's power to assert claims under UFTA derives from Section 544 of the Code, often referred to as the "strong-arm provision," which provides that:

> the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of this title or that is not allowable only under Section 502(e) of this title

11 U.S.C. § 544(b).  Section 544 grants the authority to bring certain claims for the benefit of all creditors by allowing the trustee to "step into the shoes" of the debtors' unsecured creditors in order to realize upon their state law claims.  *UMB Bank, N.A. v. Sun Capital Partners (In re LSC Wind Down, LLC)*, 610 B.R. 779, 784 (Bankr. D. Del. 2020).  To do so, "a plaintiff must allege that a creditor exists who has an allowable unsecured claim as of the petition date."  *Giuliano v. Ferdinand (In re Liquid Holdings Grp., Inc.),* Nos. 16-10202 (KG), 17-50662 (KG), 2018 Bankr. LEXIS 2650, at *5 (Bankr. D. Del. Sep. 4, 2018).  "The creditor, known as the 'triggering creditor' is indispensable for the Section 544 fraudulent transfer claim."  *Id.*

Here the Trust has identified as the "triggering creditors" for his actual fraud claims: (1) children who were born within one year prior to the Petition Date with NAS as a result of having

---

[108] Amended Compl., Counts I, III, V, and VII.

[109] The only exception relevant to the motions before me is discussed below in the section addressing the claims for constructive fraudulent transfers.

been exposed to opioids during pregnancy; (2) individuals injured by direct exposure to opioids within one year of the Petition Date; and (3) individuals diagnosed with an asbestos-related disease within one year of the Petition Date.[110]  Covidien has moved to dismiss the Actual Fraud Counts on the grounds that they are both time-barred and fail to state a claim.

    B. <u>Timeliness</u>

        *1.*   *<u>Operation of the Discovery Rule</u>*

Section 544 "confers . . . no greater rights of avoidance than the creditor would have if the creditor were asserting invalidity on its own behalf. Consequently, if the creditor is . . . barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee is likewise . . . barred.'" *UMB Bank*, 610 B.R. at 784.  Covidien argues that the Trust is barred from pursuing the actual fraud claims because all of the potentially applicable laws prohibit creditors from asserting a fraudulent transfer claim more than four years after the debtor made the transfers.

The extinguishment provisions of the UFTA adopted by each of Delaware, Missouri, and Massachusetts all apply the same limitations period to actual fraudulent transfer claims.  They provide that a cause of action with respect to a fraudulent transfer or obligation under the actual fraudulent transfer provision is extinguished unless brought "within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant."[111]

---

[110] Amended Compl. ¶¶ 307-308.  In addition to opioid-related lawsuits, the Debtors were also parties to more than 11,000 asbestos-related lawsuits primarily relating to legacy operations of predecessor companies. D.I. 128 (First Day Declaration).

[111] 6 Del. C. § 1309 ("A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought: (1) Under § 1304(a)(1) of this title, within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant"); 109A Mass. Gen. Laws Ann. ("A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought: (a) under paragraph (1) of subsection (a) of section five, within four

Since the Transfers at issue here occurred approximately a decade ago, the timeliness of the Trust's claims depends on the application of UFTA's tolling provision, which provides that the limitations period does not begin to run until "the transfer or obligation was or could reasonably have been discovered by the claimant." 6 Del. C. § 1309(1). The parties offer competing interpretations of how the tolling provision operates. Covidien argues that the one-year period starts when the Transfers *themselves* were or could reasonably have been discovered. Applying its proposed interpretation, because the Transfers were publicly announced, the one-year savings clause does nothing to extend the statute of limitations beyond the four-year period from the date of the Transfers and, therefore, it operates here to bar the Trust's claims. The Trust, on the other hand, argues that the clock does not start to run upon discovery of the Transfers alone, but upon discovery of the fraudulent nature of the Transfers. I agree.

Covidien relies primarily on the language of the statute as authority for its position that time begins to run upon discovery of the transfers themselves, pointing out that UFTA's extinguishment provision makes no reference to discovery of the fraud, but instead refers only to discovery of the transfer or the obligation. But Covidien's reading ignores entirely the remainder of the provision, which includes the words "by the claimant." *See, e.g.*, 6 Del. C. § 1309(1) (requiring an action be brought "within 1 year after the transfer or obligation was or could reasonably have been discovered <u>by the claimant</u>") (emphasis added). Under Covidien's reading, the phrase "by the claimant" would be rendered superfluous. Such a reading would not

---

years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant"); Mo. Rev. Stat. § 428.049 ("A claim for relief or cause of action with respect to a fraudulent transfer or obligation under sections 428.005 to 428.059 is extinguished unless action is brought: (1) Under subdivision (1) of subsection 1 of section 428.024, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.").

only be contrary to the rules of statutory construction,[112] but would also change the entire

purpose of tolling provisions like UFTA's, which is to provide relief for those who were unaware

that they were injured by the defendant's conduct.  *See Crouse v. Cyclops Indus.*, 745 A.2d 606,

611 (Pa. 2000) ("The discovery rule is a judicially created device which tolls the running of the

applicable statute of limitations until the point where the complaining party knows or reasonably

should know that he has been injured and that his injury has been caused by another party's

conduct.").  As the *Crouse* Court explained:

> As a general rule, it is the duty of the party asserting a cause of action to use all
> reasonable diligence to properly inform himself of the facts and circumstances
> upon which the right of recovery is based and to initiate suit within the prescribed
> period.  Therefore, the statute of limitations begins to run as soon as a right to
> institute and maintain suit arises. . . . However, in some circumstances, although
> the right to institute suit may arise, a party may not, despite the exercise of
> diligence, reasonably discover that he has been injured. In such cases the statute
> of limitations does not begin to run at the instant the right to institute suit attaches,
> rather the discovery rule applies.

*Id.*; s*ee also Knopick v. Connelly*, 639 F.3d 600, 615 (3d Cir. 2011) ("Although the discovery

rule has evolved in its application, its purpose has remained the same. A plaintiff, unable to

know of his injury or its cause because nothing has yet put him on notice of such injury, should

not be held responsible for investigating until something gives him reason to do so.").

Perhaps it is for this reason that the substantial weight of authority on this issue has held

that the one-year time period contained in UFTA's extinguishment provision does not start when

the mere existence of the transfers could have been discovered, but rather when the transfer's

fraudulent nature could have been discovered.  *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Ballard*,

213 A.3d 1211, 1238-41 (Del. Ch. 2019) (concluding that that the one-year period starts when

---

[112] *United States v. Nordic Village, Inc.*, 112 S. Ct. 1011, 1015 (1992) ("[A] statute must, if possible, be
construed in such fashion that every word has some operative effect.").

the claimant "discovered or reasonably could have discovered the fraudulent nature of the transfers for which it seeks relief"); *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 306-07 (E.D. Pa. 2011) ("Common sense would [] necessitate a finding that a cause of action for fraud will not accrue until the claimant discovered or should have discovered the facts constituting the fraud. To hold otherwise would in essence be a complete derogation of the UFTA itself.") (discussing cases); *Schmidt v. HSC, Inc.*, 131 Haw. 497, 508, 319 P.3d 416, 427 (2014) ("[I]t would be legally absurd and unjust to interpret the discovery rule to preclude claims under the UFTA if plaintiffs were never aware they held a potential claim."); *Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)*, 834 F.3d 651, 673 (6th Cir. 2016) ("[W]e find persuasive the numerous state court decisions that have concluded that a coherent reading of the UFTA's full statute of limitations provision, the overall purpose of the UFTA, and general discovery rule principles support a determination that discovery for purposes of a fraudulent transfer claim requires both knowledge of the transfer and knowledge of the transfer's fraudulent nature.").

That this is the correct application of the discovery rule is particularly clear in personal injury cases in which claimants suffer from injuries that are latent in nature or where it is not immediately apparent that it was defendant's conduct that was the cause of the injury. As one Court aptly explained in a case involving claimants suffering from asbestos-related injuries, such individuals:

> had no reason to know years earlier that they had been defrauded by transactions to which they were not a party and in which they had no conceivable interest, at a time when they had no knowledge (actual or constructive) that they had suffered any injury.

*Lippe v. Bairnco Corp.*, 229 B.R. 598, 603 (S.D.N.Y. 1999).[113]  This logic applies equally here, where it is reasonable to assume that, among the thousands of claimants that have filed personal injury lawsuits against the Debtors, there are claimants suffering from injuries who either (a) were exposed to Debtors' product for some period of time but did not manifest an injury until the year before the Petition Date; or (b) were exposed to Debtors' product, became injured, but were unaware that Debtors' product was the source of the injury until the year before the Petition Date.[114]

    Nevertheless, Covidien points to several cases that it argues demonstrate that the discovery rule only looks at whether the transfer itself was hidden or reasonably discoverable. But its cases say nothing of the kind.  Covidien has either misread or misunderstood every one of the cases it cites.

    For example, Covidien cites *Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus.)*, Nos. 12-12057 & 14-50377 (MFW), 2015 Bankr. LEXIS 2029, at *1 (Bankr. D. Del. June 18, 2015), and states that "in determining whether DUFTA's discovery rule applied, the court did not consider when the asbestos claimants discovered their injuries.  Rather, it examined merely whether the underlying transfers were reasonably discoverable and held that they were not but only because the defendants had 'secretly looted the debtor.'"[115]  But this is not what the *Kelly Capital* Court did.  First, Covidien's reference to "the asbestos claimants" implies that the case involved a Section 544 claim in which the Trust was relying on asbestos claimants as its triggering creditor.  It did not.  There were no asbestos claimants involved in the case before the

---

[113] Although Covidien argues that *Lippe* is inapposite because it was decided under a provision that tolls the statute until the transfer "was discovered" by the claimant as opposed to "when it could reasonably have been discovered," I find the reasoning in the above-quoted passage to apply equally to the provision before me.

[114] I use these examples without making any finding regarding when a cause of action from an opioid-related or asbestos-related injury "arises" under applicable state law.

[115] Reply Br., D.I. 26, at 4.

*Kelly Capital* Court – in fact, there was no mention of a specific triggering creditor at all.

Rather, the Court's analysis mentions only "a creditor" or "a claimant" generically.  Second, the

Court did not, as Covidien suggests, focus on whether the <u>transfers</u> were hidden but clearly

stated that "if the <u>fraud</u> is hidden [] the statute of limitations is extended to one year after the

<u>fraud</u> was or could reasonably have been discovered by a claimant."  *Id.* at *21-22 (emphasis

added).  Applying this rule, the Court then stated that because the complaint contained facts

"suggestive of the difficulty of reasonable discovery by a creditor <u>of any fraud</u>[,]" the Court

could not conclude from the face of the complaint that the tolling provision did not apply."  *Id.*

(emphasis added).  For this reason, the Court held that "it would be inappropriate to dismiss the

Trustee's actual fraud claims at this point."  *Id.* at *22.

 Covidien next points to *Burkhart v. Genworth Financial, Inc.*, 250 A.3d 842 (Del. Ch.

Ct. 2020), as "holding [the] discovery rule inapplicable and dismissing fraudulent transfer

complaint as time-barred where defendant parent company's Form 10-K disclosed company's

plan to separate subsidiary from its more profitable affiliates more than one year before suit."[116]

But again, this misrepresents the *Genworth* Court's holding in multiple ways.  First, the Court

did not hold that the discovery rule was inapplicable, but rather applied it to the facts alleged in

the complaint and determined that it failed to save the claim from being untimely.  *Id.* at 860-61

(holding "[p]laintiffs' Complaint, filed in September 2018, is untimely because it was filed more

than one year after February 2017, when the general fraudulent scheme motivating the 2012-14

Dividends 'was or could reasonably have been discovered'").  Second, in concluding that the

discovery rule would not save plaintiffs' claim the Court did not, as Covidien suggests, just rely

on the fact that the transfers were publicly disclosed.  Rather, the Court pointed to a confluence

of several facts that should have caused plaintiffs to suspect wrongdoing.  Specifically, the Court

---

[116] Opening Br., D.I. 15, at 17.

observed that the "red flags" that "signaled all the major ingredients for [Defendant's] alleged

plan" included the fact that adjustments to the financials and "a plummeting stock price betrayed

that GLIC was not as healthy as the Statutory Financials let on" and that the parent "openly

announced an intent financially to isolate GLIC, and the dramatic premium increases hinted at a

desperate attempt to right the sinking ship." *Id.* at 860.

Finally, Covidien points to my decision in *Miller v. Anderson Media Corp. (In re Our*

*Alchemy)*, 642 B.R. 155 (Bankr. D. Del. 2022), as "holding that the discovery rule applies 'only

if the fraud is hidden.'"[117]  This is a completely inaccurate interpretation of my prior ruling.

While the words "if the fraud is hidden" can be found in the opinion, they are: (1) not my own

words; (2) not preceded by the word "only"; and (3) not made in connection with the holding of

the case.  Rather, the phrase (without the word "only") is located within a parenthetical quotation

attributed to the *National Kelly* decision discussed above, in reference to the applicable legal

standard.  The relevant portion of the opinion reads as follows:

> The discovery rule extends the time in which a claimant may file a claim by one
> year after the plaintiff knew or could have reasonably discovered the transfer and
> its fraudulent nature. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
> 712 F.3d 185, 195 (5th Cir. 2013) ("we *Erie* guess that the Texas Supreme Court
> would conclude that section 24.010(a)(1) of TUFTA requires that a fraudulent-
> transfer claim must be filed within one year after the fraudulent nature of the
> transfer is discovered or reasonably could have been discovered."); *Forman v.*
> *Kelly Capital, LLC (In re Nat'l Serv. Indus.)*, Ch. 7 Case No. 12-12057, Adv. No.
> 14-50377, 2015 Bankr. LEXIS 2029, at *21 (Bankr. D. Del. June 18, 2015) ("**If**
> **the fraud is hidden**, however, the statute of limitations is extended to one year
> after the fraud was or could reasonably have been discovered by the creditor.").

*Anderson Media Corp.*, 642 B.R. at 163 (emphasis added).  My holding in that case, stated later

in the opinion, was not, as Covidien represents, that the discovery rule only applies if the fraud is

hidden.  It was that "whether facts giving rise to the Trustee's claims were known or reasonably

---

[117] Opening Br., D.I. 15, at 17.

knowable more than a year before the 2021 Action was commenced is a question of fact not appropriate for determination at this stage." *Id.* at 165.

In sum, none of the cases that Covidien cites could, applying even the most liberal of interpretations, be fairly read as standing for the proposition that if creditors knew about the transfers, as opposed to the fraudulent nature of the transfers, the discovery rule does not apply.

Covidien's last argument on this issue is that the Trust's proposed interpretation of the tolling provision "flies in the face" of the "purpose" of UFTA's extinguishment provision, which it contends is not a statute of limitations, but a statute of repose, designed to protect defendants by creating a finite period within which a defendant can be sued for a particular transaction.[118] Again, Covidien is incorrect in its statement of the law. While the subsection of UFTA's extinguishment provision applicable to constructive fraudulent transfer claims is a statute of repose, the subsection applicable to claims for actual fraudulent transfer is a statute of limitations. *Miller v. Fallas (In re J & M Sales, Inc.)*, Nos. 18-11801 (JTD) & 20-50775, 2021 Bankr. LEXIS 2268, at *69 & n.138 (Bankr. D. Del. Aug. 20, 2021) (explaining that Section 1309(1), applicable to actual fraud claims, is a statute of limitations and Section 1309(2), applicable to constructive fraud claims, is a statute of repose).

The difference between the two was aptly explained by the Third Circuit in *In re Exxon Mobil Corp. Sec. Litig.*:

> Unlike statutes of limitations, which traditionally do not begin to run until a cause of action has accrued (*i.e.*, when all required elements have occurred) and the onset of which is often subject to delay by late discovery of the injury (or when a reasonable person should have discovered it), statutes of repose start upon the occurrence of a specific event and may expire before a plaintiff discovers he has been wronged or even before damages have been suffered at all.

---

[118] Reply Brief, D.I. 26, at. 4.

500 F.3d 189, 199 (3d Cir. 2007). *See also Cheswold Volunteer Fire Co. v. Lambertson Constr. Co.*, 489 A.2d 413, 416 (Del. 1984) ("[A]n ordinary statute of limitations [does] not begin to run until either the date of the injury or its discovery[.]"); *Worker's Comp. Fund v. Kent Constr. Corp.*, No. 07A-06-008 FSS, 2008 Del. Super. LEXIS 352, at *9 (Del. Super. Ct. Sep. 19, 2008) ("A statute of repose, however, can begin to run before the cause of action arises because it begins 'irrespective of the date of injury.' In other words, when the cause of action triggers the statute, it is a statute of limitations. When the cause of action is not the trigger, it may be a statute of repose.") (quoting *Cheswold*, 489 A.2d at 420).

Covidien is correct that statutes of repose are intended to create a finite period within which a defendant can be sued for a particular transaction. *Goad v. Celotex*, 831 F.2d 508, 511 (4th Cir. 1987) ("In contrast to statutes of limitation, statutes of repose serve primarily to relieve potential defendants from anxiety over liability for acts committed long ago."). Consistent with this purpose, statutes of repose do not contain tolling provisions. *See* 4 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1056, p. 240 (3d ed. 2002) ("[A] critical distinction is that a repose period is fixed and its expiration will not be delated by estoppel or tolling."). *See also Lampf v. Gilbertson*, 501 U.S. 350, 363 (1991) ("[A] period of repose [is] inconsistent with tolling."); *CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014) ("[A] statute of repose is a judgment that defendants should be free from liability after the legislatively determined period of time, beyond which the liability will no longer exist and will not be tolled for any reason.") (internal quotations omitted) *superseded by statute on other grounds as noted in In re Dow Corning Corp.*, 778 F.3d 545, 553 n.2 (6th Cir. 2015).

Applying these principles here, it becomes clear that the UFTA subsection applicable to actual fraudulent transfer claims is a statute of limitations because, unlike the subsection

applicable to constructive fraud claims, it does not begin to run until the claimant's cause of action arises. 6 Del. C. 1309(1) (providing cause of action is extinguished unless brought "within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.").[119] Accordingly, Covidien's argument that the Trust's interpretation is inconsistent with the purposes of a statute of repose is misplaced.

For these reasons, I am persuaded that the Trust's interpretation of the discovery rule is correct.

### 2. *Application of the Discovery Rule*

Having concluded that UFTA's tolling provision begins to run upon the discovery of the fraudulent nature of the transfer, the question then becomes: can it be determined from the facts alleged in the Amended Complaint that the triggering creditors' claims would be time-barred? The answer is no.

 "Generally, the plaintiff bears the burden of showing that the discovery rule tolls the statute of limitations." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014). "However, while a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." *Id.*

---

[119] Confusion between the two terms is understandable given that they are often used interchangeably. *See Nathan v. Whittington*, 408 S.W.3d 870, 873–74 (Tex. 2013) ("We have found that some courts, including the high courts of several states, have referred to this UFTA provision as a "statute of limitations," while others have referred to it as a "statute of repose." *See K-B Bldg. Co. v. Sheesley Constr., Inc.*, 2003 PA Super 372, 833 A.2d 1132, 1133 n.1 (Pa. Super. Ct. 2003) (noting that its "review of decisions of other jurisdictions reveals that [the provision] is referred to as both a statute of limitations and a statute of repose"). *See also*, *e.g.*, my opinion in *Miller v. Anderson Media Corp. (In re Our Alchemy, LLC)*, in which I mistakenly referred to all of Section 1309 as a statute of repose, when, as explained above, it is only a statute of repose in part. 642 B.R. 155, 163 (Bankr. D. Del. 2022) (stating, in *dicta*, that "[u]nder both DUFTA and TUFTA there is a four-year statute of repose for fraudulent transfer claims based on either constructive or actual fraud."). But this tendency of courts toward colloquial imprecision has no bearing on the nature of the statute itself.

"This distinction comes to the fore [] where the applicability of the discovery rule is not evident on the face of the complaint[,] but the plaintiff also does not plead facts that unequivocally show that the discovery rule does not apply." *Id.* Applying these guidelines here, it is clear that the Trust has not pled itself out of court and the Actual Fraudulent Transfer claims cannot be dismissed on a statute of limitations defense.

Although the Trust has pled that triggering creditors exist,[120] it has not identified those creditors by name. While it is not necessary at this point in the case that it do so,[121] the lack of a specific claimant makes applying the discovery rule at this stage rather difficult. As the Third Circuit stated in *Schmidt*, determining whether the discovery rule applies requires determining whether the plaintiff acted with reasonable diligence in asserting a claim. *Schmidt v. Skolas*, 770 F.3d at 252. *See also Crouse v. Cyclops Indus.*, 560 Pa. 394, 404, 745 A.2d 606, 611 (2000) ("In order to determine when the statute should begin to run, the finder of fact focuses on whether the plaintiff was reasonably diligent in discovering his injury."). That is not a determination capable of being made on the limited information included in the Amended Complaint before me, which identifies the "plaintiffs" only by reference to the category of claim they hold against the Debtors.[122]

---

[120] Covidien does not dispute that the claimants on which the Trust relies for its Actual Fraudulent Transfer Claims are likely to exist and otherwise meet the requirements of Section 544 (though I make no finding in that regard here).

[121] *See* 5 COLLIER ON BANKRUPTCY ¶ 548.02 (16th 2023) ("[S]o long as the trustee pleads the existence of a creditor who could have avoided the transfer, the trustee need not identify a specific creditor by name."); *Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr. D. Del. 2001) ("When analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must ultimately prove such a creditor exists.").

[122] See Amended Compl., ¶¶ 307-08 (identifying the "triggering creditors" as: (1) children born with NAS due to opioid exposure within one year of the Petition Date; (2) individuals injured by direct exposure to opioids within one year of the Petition Date; and (3) individuals diagnosed with an asbestos-related disease within one year of the Petition Date).

Although Covidien argues that this issue is easily resolvable on a motion to dismiss in this case because both the Transfers themselves and all of the alleged "red flags" about the Transfers on which the Trust relies were public knowledge, this only proves that the relevant information was generally knowable; not that it was knowable <u>by the claimants</u>, which is the relevant inquiry. Covidien points to nothing in the Amended Complaint that speaks to what the particular claimants at issue here would have known and when they would have known it. Nor could it until the claimants are specifically identified.

While this situation is certainly unusual, it serves as a good example of the general proposition that application of the discovery rule is a fact-intensive undertaking not typically suited for a motion to dismiss. S*chmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) ("Pursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue[.]"); *Id.* ("[O]nly where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law."); *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014) ("Frequently, determining whether the statute of limitations has been tolled pursuant to the 'discovery rule' or due to fraudulent concealment requires a factual inquiry not amenable to resolution on a motion to dismiss.").

Because the question of whether the fraudulent nature of the Transfers was known or knowable to the triggering creditors more than a year before the Petition Date is a question of fact not appropriate for determination at this stage, Covidien's motion to dismiss the Actual Fraud Claims as time barred is denied.

C.  <u>Failure to State a Claim</u>

Having established that the Actual Fraud Claims are not time-barred, I must next consider whether, as Covidien contends, they fail to state a claim.

A plaintiff seeking to recover a transfer as "actually" fraudulent, as opposed to "constructively" fraudulent, must demonstrate that the transfer was made with actual intent to hinder, delay, or defraud the debtors' creditors. *See, e.g.*, 6. Del. C. § 1304(a)(1). "[B]y 'actual intent,' the statute contemplates intent 'existing in fact or reality[.]'" *Kirschner v. Large S'holders (In re Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 160 (2d Cir. 2021) (quoting *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776, 206 L. Ed. 2d 103 (2020) (holding, in context of ERISA, that "actual" means "existing in fact or reality," more than "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal").

For an actual fraudulent transfer claim, Federal Rule 9(b), made applicable to this proceeding pursuant to Bankruptcy Rule 7009, imposes a heightened pleading requirement, mandating that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud[.]" However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Covidien argues that the Trust has failed to allege with sufficient particularity that the Transfers were made with actual intent to defraud Mallinckrodt's creditors for two reasons: 1) it has not included any allegations regarding the intent of Covidien's officers or directors; and 2) it has not demonstrated the presence of enough badges of fraud.

### 1. *Direct Evidence of Intent*

Covidien's first argument is that the Actual Fraud Claims must be dismissed because the Trust has failed to allege that Covidien's board members intended to hinder, delay, or defraud Mallinckrodt's creditors. Covidien's argument is based on its assumption that the intent of a corporate entity can only be established through allegations detailing the intent of the individuals in a position to control the disposition of the property in question. Here, since only Covidien's

board of directors had the legal authority to approve the Spinoff, Covidien argues that the Trust

was required to plead allegations that give rise to the inference that the board members had

fraudulent intent.[123]   According to Covidien, because the Amended Complaint does not include

allegations regarding the intent of the individual Covidien directors or the board as a whole, it

must be dismissed.

     While I agree with the general proposition that a corporation can only act through its duly

authorized agents,[124] I take issue with Covidien's suggestion that a plaintiff asserting a claim for

actual fraudulent transfer can only establish fraudulent intent through allegations that detail the

specific intent of those agents.   It is well-established that a plaintiff may establish intent in an

actual fraudulent transfer case in one of two ways: (1) through direct evidence; or (2) through

circumstantial evidence.   *Friedman v. Wellspring Capital Mgmt., LLC (In re SportCo Holdings,*

*Inc.)*, Nos. 19-11299, 20-50554 (JKS), 2021 Bankr. LEXIS 2848, at *33 (Bankr. D. Del. Oct. 14,

---

[123]   Reply Brief, D.I. 26 at 12.   While it is usually the intent of the debtor, as transferor, that is relevant in a fraudulent transfer inquiry, where the transferee dominates or controls the debtor, the transferee's intent will be imputed to the debtor.   *Cleveland-Cliffs Burns Harbor Ltd. Liab. Co. v. Boomerang Tube, Ltd. Liab. Co.*, No. 2022-0378-LWW, 2023 Del. Ch. LEXIS 359, at *21-22 (Ch. Sep. 5, 2023) ("For a fraudulent conveyance claim, the actual fraudulent intent of an entity exercising control over a transferor may be imputed to the transferor.").   Although I make no finding regarding the degree to which Covidien exercised control over Mallinckrodt, if any, the Trust has alleged facts in the Amended Complaint sufficient to support such a finding.   Additionally, Covidien has conceded that it is Covidien's intent that is relevant here.   *See* Opening Br. at 25 (stating that "Plaintiff 'was required to plead allegations that gave rise to a strong inference that [Covidien's board of directors] had the 'actual intent to hinder, delay, or defraud' Mallinckrodt's creditors").

[124]   As Judge Goldblatt recently discussed in his decision in *Drivetrain, LLC*, "[a] basic tenet of corporate law, derived from principles of agency law, is that knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself. . . . The underlying reason, the Third Circuit explained, is that a corporation can speak and act only through its agents. . . . Thus, in the fraudulent conveyance context, so long as a corporation's agent had the requisite fraudulent intent when it caused the corporation to carry out the transaction, that intent is imputed to the corporation.   That principle, however, is subject to an exception when the action in question is one that cannot be decided and executed upon by any employee, but instead is a matter that was subject to the approval of the corporation's board of directors. . .  it is the intent of the relevant decisionmaker — the majority of the members of the board of directors — that is imputed to the corporation."   *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, Nos. 20-12702 (CTG), 22-50439 (CTG), 22-50441 (CTG), 22-50443 (CTG), 2023 Bankr. LEXIS 2584, at *26 (Bankr. D. Del. Oct. 19, 2023) (internal quotation marks and citations omitted).

2021) ("For an actual fraudulent transfer claim to survive a motion to dismiss, the plaintiff must

allege facts that, taken as true, establish direct or circumstantial evidence of intent to defraud.");

*Charys Liquidating Tr. v. Growth Mgmt., LLC (In re Charys Holding Co.)*, No. 08-10289 (BLS),

2010 Bankr. LEXIS 2073, at *8 (Bankr. D. Del. July 14, 2010) ("It is not a defendant's

fraudulent intent that must be pled with particularity, but the circumstances constituting fraud.").

The law does not require direct evidence alone because people do not frequently declare their

intent to do something unlawful.  *See MSKP Oak Grove, LLC v. Venuto*, 839 Fed. Appx. 708,

712 (3d Cir. 2020) ("Because debtors rarely admit fraudulent intent, courts must usually infer

it.").  *See also In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("Because

direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial

evidence to infer fraudulent intent.").

      To demonstrate fraudulent intent in the absence of direct evidence, claimants typically

rely on "'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers

that their presence gives rise to an inference of intent."  *Kirschner v. Large S'holders (In re

Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 160 (2d Cir. 2021).  Covidien

suggests the Second Circuit's recent decision in *Tribune* holds that more is required in a case like

this one where the board possessed sole authority over the disposition of the company's property.

I disagree and read *Tribune* to be fully consistent with the above-described principles.

      In *Tribune*, plaintiff, the bankruptcy litigation trustee, asserted fraudulent transfer and

other claims arising out of a leveraged buyout that took the then-publicly traded Tribune

Company private.  *Id.* at 155.  While the board of directors would typically approve such a

transaction, the Tribune board delegated its authority to a special committee of independent

directors.  *Id.* at 160.  Accordingly, to state a claim for actual fraud, the plaintiff had to establish

that the special committee possessed intent to defraud in approving the transaction. *Id.* at 161 ("[F]or an intentional fraudulent transfer claim, which requires 'actual intent,' a company's intent may be established only through the 'actual intent' of the individuals 'in a position to control the disposition of [the transferor's] property.'") (quoting *In re Roco Corp*, 701 F.2d 978, 984 (1st Cir. 1983)).

Although Covidien focuses primarily on the *Tribune* Court's discussion of the plaintiff's attempt to prove intent through direct evidence, the plaintiff did endeavor to establish the requisite fraudulent intent using both direct and circumstantial evidence:

> The Trustee makes two arguments in support of his intentional fraudulent transfer claims. First, he argues that Tribune's senior management possessed actual intent to defraud, and that intent should be imputed to the Special Committee. Second, even assuming the imputation argument fails, the Trustee maintains that Independent Directors on the Special Committee had the required intent as demonstrated by "badges of fraud."

*Id.* at 161. The Court found that the plaintiff failed at both. With respect to direct evidence, the Court concluded that the plaintiff could not impute management's intent to the special committee because it failed to allege that management improperly pressured the special committee to approve the transaction or otherwise dominated the committee. *Id.* at 161. With respect to the circumstantial evidence, the Court held "while some [] factors arguably weigh in favor of the Trustee, in the end we conclude that the district court correctly held that the Trustee failed to plead 'badges of fraud' sufficient to raise a strong inference of actual fraudulent intent on the part of the Special Committee." *Id.* at 162.

While Covidien argues that the *Tribune* holding applies here to preclude the Trust's actual fraud claims, I fail to see how. First, unlike *Tribune*, I do not read the Amended Complaint here as alleging direct evidence of intent. While there are many allegations throughout the Amended Complaint detailing the actions or statements of individuals, including

49

some board members, the statement of the claim plainly alleges that intent can be inferred from the circumstances rather than any specific statements or events.  The averments of Count I, for example, state:

> 315.   The intent to hinder, delay, or defraud the Debtors' creditors, including present and future Opioid Claimants, is apparent from, *inter alia*, the direct and natural consequence of the Spinoff prejudicing the rights of Opioid Claimants by depriving the Debtors and their bankruptcy estates of the value of the Note Proceeds and the assets of Covidien and its direct and indirect subsidiaries.

> 316.   Such intent is also apparent from abundant "badges of fraud. . . ."[125]

Because the Trust is not attempting to establish intent through direct evidence, *Tribune's* discussion of how the allegations of direct evidence of intent fell short in that case is irrelevant here.  Second, while *Tribune*'s statements regarding what a plaintiff must prove are applicable here — specifically that the Trust must plead "badges of fraud" sufficient to raise a strong inference of actual fraudulent intent on the part of those in control of the transfer in question – the reasons that the *Tribune* plaintiff was unable to do so do not necessarily apply equally to the facts of this case.  Specifically, as set forth in greater detail below, here, the Trust has pled the existence of sufficient "badges of fraud" to raise the necessary inference of fraudulent intent on the part of Covidien's board.

## 2.  *Circumstantial Evidence of Intent:  "Badges of Fraud"*

As noted above, while allegations regarding the state of mind of the board would certainly satisfy a plaintiff's requirement to plead intent with specificity, it is not the only acceptable approach.  In lieu of direct evidence of intent, a plaintiff may establish intent through circumstantial evidence, often referred to as "badges of fraud."

---

[125] Amended Complaint ¶¶ 315, 316. See also Counts III, V, and VII.

The UFTA adopted by most states includes a codified list of "badges of fraud" to be

considered.  For example, Delaware's UFTA states that:

> In determining actual intent under paragraph (a)(1) of this section, consideration
> may be given, among other factors, to whether:
>
> (1) The transfer or obligation was to an insider;
>
> (2) The debtor retained possession or control of the property transferred
> after the transfer;
>
> (3) The transfer or obligation was disclosed or concealed;
>
> (4) Before the transfer was made or obligation was incurred, the debtor
> had been sued or threatened with suit;
>
> (5) The transfer was of substantially all the debtor's assets;
>
> (6) The debtor absconded;
>
> (7) The debtor removed or concealed assets;
>
> (8) The value of the consideration received by the debtor was reasonably
> equivalent to the value of the asset transferred or the amount of the
> obligation incurred;
>
> (9) The debtor was insolvent or became insolvent shortly after the transfer
> was made or the obligation was incurred;
>
> (10) The transfer occurred shortly before or shortly after a substantial debt
> was incurred; and
>
> (11) The debtor transferred the essential assets of the business to a lienor
> who transferred the assets to an insider of the debtor.

6 Del. C. § 1304(b).[126]  These considerations are not exclusive and "[a] court may, of course,

consider factors other than the traditional badges of fraud in an analysis of fraudulent intent."  *In*

*re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011).  "For example, '[i]f the 'natural

consequence' of a debtor's action' is to hinder, delay or defraud creditors, a court may infer an

---

[126] The provisions of the Missouri and Massachusetts UFTAs are the same.  *See* 109A Mass. Gen. Laws
Ann. § 5 and § 428.024 R.S. Mo.

intentional fraudulent conveyance." *Kirschner v. J.P. Morgan Chase Bank, N.A. (In re Millennium Lab Holdings II, LLC)*, Nos. 15-12284 (LSS), 17-51840 (LSS), 2019 Bankr. LEXIS 636, at *9 (Bankr. D. Del. Feb. 28, 2019).   "The presence or absence of any single badge of fraud is not conclusive." *Fedders*, 405 B.R. at 545.   One badge "may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."  *Id.*

The parties have addressed seven of the eleven factors listed in the applicable UFTA provisions:[127]

*Transfer To or For the Benefit of an Insider*

The first badge looks at whether "the transfer or obligation was to an insider."  6 Del. C. § 1304(b)(1).  The Trust argues that this badge is present here because at the time of the Spinoff, Covidien was the parent company of the Debtors and dominated and controlled the Debtors to such a degree that Debtors can be considered the alter egos or mere instrumentalities of Covidien.

As this Court has previously held, "'transfers to an affiliate are deemed transfers to insiders.'"  *Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.*), 641 B.R. 467, 514 (Bankr. D. Del. 2022) (quoting *Tronox Inc. v. Kerr McGee Corp. (In re Tronax Inc.)*, 503 B.R. 239, 283 (Bankr. S.D.N.Y. 2013).  In fact, UFTA defines the term "insider" to include affiliates. *See e.g.,* 6. Del. C. 1301(7)(d) (defining "insider" as "an affiliate or an insider of an affiliate as if the affiliate were the debtor").

---

[127] With the exception of one, the remaining factors -- that the debtor absconded, the transfer occurred before a substantial debt was incurred, and the transfer was to a lienor who transferred to an insider -- are not applicable to the facts of this case.  The last factor, that the debtor removed or concealed assets, was not addressed by the parties, but is nevertheless addressed below.

Covidien argues that the companies' parent/subsidiary relationship cannot be the basis for a finding of fraudulent intent because it is a feature of every spinoff transaction. While I agree that, standing alone, this factor would likely not be sufficient evidence of fraudulent intent, when it is present along with other badges of fraud – as is the case here – it may be persuasive. For this reason, the case that Covidien cites in support of its argument is inapposite. In *U.S. Bank National Association v. Verizon Communications., Inc.*, the Fifth Circuit affirmed the district court's finding that the plaintiff had failed to allege sufficient evidence of intent where the only badges of fraud present were transfer to an insider and transfer shortly before a substantial debt was incurred. As the district court had explained, "these two badges alone could not support a finding of intent in a spin-off since they 'are a feature of every spin[-]off transaction that involves debt.'" 761 F.3d 409, 435 (5th Cir. 2014). Here, however, as discussed below, this badge is one of many present.

The Trust has alleged sufficient facts to support the conclusion that this badge is present.

*Sued or Threatened with Suit*

The next badge is whether "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." 6 Del. C. § 1304(b)(4). "This factor is listed as a badge of fraud because the pendency of litigation implies fraudulent intent when the circumstances show that there is a causal connection between the threatened litigation or judgment and the transfer." *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Texas)*, 421 B.R. 251, 310-11 (Bankr. W.D. Tex. 2009) (citations omitted)). *See also Dickinson v. Ronwin*, 935 S.W.2d 358, 364 (Mo. Ct. App. 1996) ("Conveyances made for the purpose of defeating an anticipated judgment in a case pending or about to be commenced are in fraud of creditors and void as to such plaintiff.") (citation and internal quotation marks omitted)).

The Trust argues that the fact that Covidien announced the Spinoff only two weeks after it received notice of a DEA subpoena investigating Mallinckrodt and Covidien's opioid practices suggests that the DEA's investigation was the impetus for the Spinoff.  Covidien counters that, as the Trust concedes in its allegations, Covidien had begun planning the Spinoff more than a year prior to its receipt of the DEA Subpoena and the DEA's investigation was settled for a mere $35 million, which had little financial impact on Mallinckrodt.  Further, Covidien notes, it was the opioid lawsuits that pushed Mallinckrodt into bankruptcy and the Trust has not alleged that a single opioid lawsuit was pending or even threatened against Mallinckrodt at the time of the Spinoff.

Considering the allegations of the Amended Complaint as a whole, I find that the Trust has adequately alleged facts that would support the reasonable conclusion that there was a causal connection between the threat of litigation and the Transfers.  While I agree with Covidien that it does not appear from the allegations that it was the DEA Subpoena alone that motivated the Spinoff, the allegations do suggest that the threat of liability arising from or relating to the production and sale of opioids was a motivating factor.   The fact that no opioid lawsuits had yet been filed against Mallinckrodt at the time of the Transfers is not dispositive.  The Trust has alleged facts that suggest that the threat of significant liability associated with the manufacture and sale of opioids was a growing concern of the board, including that:

> In 2011, following Purdue Pharma's release of an abuse-deterrent form of its OxyContin product, Mallinckrodt was informed by the DOJ that its 30 mg generic oxycodone tablets had replaced the old formulation of OxyContin as the main illicit drug on the streets in New England.[128]

> In April 2011, the executive committee of Covidien's board received a presentation noting that the DEA had suspended the licenses and issued fines against distributors for their failure to maintain effective controls against diversion of controlled substances.   The presentation concluded that the

---

[128] Amended Compl. ¶ 129.

Monitoring System that Mallinckrodt had in place before June 2010 "was not comprehensive enough to meet emerging guidance from [the] DEA" and warned that "Mallinckrodt is viewed as the kingpin within the drug cartel."[129]

A few days after the presentation, Covidien's general counsel emailed his staff that "there is a growing sense of concern at the executive committee level about controlled substance sales to Florida." He continued:

> Even though we say – and believe – that we are complying with our legal obligations . . . the . . . [executive committee] wonders what our exposure is and whether there are other things we should be doing.[130]

In her April 23, 2011 notes from a DEA conference, a Covidien compliance officer noted that a DEA representative said "I am coming[.] You don't want me[.] I can 'tear you apart[.]'" If the DEA can see where the drugs are going, Mallinckrodt knows full well where the drugs are going[.]"[131]

In May 2011, Covidien told its employees not to send information about the suspicious order monitoring system and pill mills in emails, warning employees against putting "complex thoughts" in writing and encouraging them to have conversations instead.[132] When the topic of discussion pertained to opioids, Covidien urged its employees to "have a meeting . . . or call" rather than putting their thoughts into emails. When opioid related issues did have to be in writing, Covidien instructed employees to include or copy an in-house lawyer on the communications in an attempt to set up a claim for privilege. Additionally, certain documents addressing legal or regulatory issues were delivered to personnel in printed form rather than transmitted by email.[133]

On January 17, 2013, an internal presentation titled "Pharmaceuticals Business Update" acknowledged the negative press surrounding opioids and stated "DEA and FDA under pressure to curb abuse and misuse of opiates." The presentation also noted that the DEA was raiding wholesalers and pharmacies.[134]

That same day, Covidien's board approved an information statement for prospective Mallinckrodt shareholders that acknowledged the risk of substantial opioid related liability. It stated:

> We are or may be involved in various legal proceedings and certain government inquiries and investigations, including, but not limited to,

---

[129] *Id.* ¶ 205.
[130] *Id.* ¶ 206.
[131] *Id.* ¶ 236.
[132] *Id.* ¶ 245.
[133] *Id.* ¶ 246.
[134] *Id.* ¶ 216.

> patent infringement, product liability, antitrust matters, breach of contract, Medicare and/or Medicaid reimbursement claims, or compliance with laws relating to marketing and sales or controlled substance distribution practices, including those relating to the establishment of suspicious order monitoring ("SOM") programs. Such proceedings, inquiries, and investigations may involve claims for, or the possibility of fines and penalties involving substantial amounts of money or other relief including, but not limited to civil or criminal fines and penalties and exclusion form participation in various government healthcare-related programs. If any of these legal proceedings, inquiries, or investigations were to result in an adverse outcome, the impact could have a material adverse effect on our competitive position, business, financial condition, results or operations and cash flows.[135]

The Amended Complaint further alleges facts that suggest that it was a priority for Covidien to separate itself from Mallinckrodt's potential opioid liabilities:

> In 2010, Covidien initially pursued a sale of Mallinckrodt, with the key requirement that the buyer assume all of Mallinckrodt's "litigation and government liabilities."[136]

> In March 2011, Covidien's board noted that it would only approve a sale to a prospective buyer if "they assume liabilities."[137]

> In April 2011, a group chief financial officer for Covidien emailed Covidien's assistant treasurer stating that he wanted to speak about a prospective purchaser of Mallinckrodt. The treasurer replied, "Ok, expecting their offer, if any, on the 11th[,] to which the CFO responded "If any???[,]" which prompted the treasurer to reply "Not putting it in an email."[138]

> A potential buyer made an offer of $4 billion for Mallinckrodt, but refused to assume any liabilities with the sale, including opioid liabilities. Although Mallinckrodt's assets were only worth, at most, $3.3 billion at the time, Covidien rejected the offer.[139]

> Goldman Sachs made a presentation to Covidien's board that compared the benefits of a spinoff to the benefits of a sale. Goldman identified the "ability to transfer contingent liabilities' as a benefit of a sale. It also stated that "due to significant contingent liabilities, SpinCo should be conservatively levered."[140]

---

[135] *Id.* ¶ 207.
[136] *Id.* ¶ 248.
[137] *Id.* ¶ 249.
[138] *Id.* ¶ 249.
[139] *Id.* ¶252.
[140] *Id.* ¶ 250.

In a January 19, 2012, presentation to Covidien's board, "unpredictable liability exposure" was listed as one of the rationales for spinning off the pharmaceuticals business.[141]

These allegations are in addition to those that detail the multiple subpoenas served on Mallinckrodt relating to its opioid production and sales, as well as the investigations, lawsuits, fines, and shutdowns Mallinckrodt's competitors and customers were facing.  Together, these facts demonstrate that, at the time of the Transfers, Covidien was in the possession of information that suggested liability arising out of the manufacture, sale, marketing, and/or distribution of opioids was looming, and that Covidien intended for the Spinoff to insulate it from that liability.

The Trust has alleged sufficient facts to support the conclusion that this badge is present.

*Substantially all the assets*

The next badge of fraud is whether "the transfer was of substantially all of the debtor's assets."  6 Del. C. § 1304(b)(5).

The Trust argues that it has pled sufficient facts to support this badge, pointing to its allegations that the Spinoff resulted in Covidien retaining 80% of the total assets of the pre-Spinoff Covidien enterprise and Mallinckrodt retaining all the opioid liabilities.  Covidien responds that the Trust's argument is premised on the false assumption that Mallinckrodt actually owned any portion of the non-pharmaceutical businesses that Covidien retained in the Spinoff and that in every spinoff the parent retains the businesses that it does not spin off.

Even assuming that Covidien is correct, and that Mallinckrodt did not technically have any ownership interest in the non-pharmaceutical assets that Covidien retained, the facts alleged still support the conclusion that this badge is present.  As Judge Sontchi explained in *Burch v.*

---

[141] *Id.* ¶ 250.

*Masiz*, the analysis here is not a technical or strictly mathematical one, but is instead a qualitative

assessment of whether the challenged transaction was one of relative significance to the debtor:

> Defendants argue that a transfer of anything less than 50% of Debtor's assets is
> not substantially all of those assets. That cannot be the case. The law is not
> "majority of," but, the more amorphous "substantially all." One can easily
> imagine substantially all of a company's asset being less than a majority. Consider
> a manufacturing company that transfers its largest operating division valued at
> 48% of the company's assets leaving behind a number of small, disparate,
> unrelated operations and cash. The company has fundamentally changed and, in
> that case, it must be that substantially all of its assets have been sold.

*Burtch v. Masiz (In re Vaso Active Pharm., Inc.)*, Nos. 10-10855 (CSS), 11-52005 (CSS), 2012

Bankr. LEXIS 4741, at *45-46 (Bankr. D. Del. Oct. 9, 2012).  Here, the Trust has alleged that

the pre-Spinoff Mallinckrodt was stripped of cash, saddled with new debt, and left to face the

burgeoning liabilities of an increasingly risky business model without the benefit of the

infrastructure or assets of the parent enterprise on which it heavily relied.  In other words, it has

alleged that through the Spinoff it was fundamentally changed.

The Trust has alleged sufficient facts to support the conclusion that this badge is present.

*Insolvency*

The next badge of fraud is whether "the debtor was insolvent or became insolvent shortly

after the transfer was made or the obligation was incurred."  6 Del. C. § 1304(b)(9).  The Trust

argues that it has pled that Mallinckrodt was insolvent at the time of the Spinoff, pointing to its

allegations that (1) the opioid-related liabilities that Mallinckrodt faced were of such magnitude

that they far outweighed the company's assets under any standard; and (2) there were concerns

expressed about Mallinckrodt's solvency both internally and by Covidien's advisors prior to the

Spinoff.   While I am not persuaded that there are sufficient facts to support the conclusion that

Mallinckrodt's potential opioid liabilities rendered it insolvent in 2013, I am convinced that

considering the allegations of the Amended Complaint in their entirety, insolvency has been sufficiently pled.

The Amended Complaint includes a number of allegations that suggest that Mallinckrodt's lack of cash in combination with its contingent liabilities was a concern of Covidien, its professionals, analysts, and Mallinckrodt's newly formed leadership team. These include:

> A 2011 board presentation that stated "insufficient resources" was a top risk to a successful spinoff.[142]

> A May 2011 draft presentation on the proposed spinoff noted that Mallinckrodt post-spin would have an investment credit rating "no higher than BBB." The same document set a target rating of "A" for Covidien after the Spinoff.[143]

> An April 2012 document titled "Mallinckrodt Strategy Review" included as key risks to the spinoff, "financial inflexibility (capital structure)," and "capital demands"[144]

> A May 2012 board presentation that noted standalone Mallinckrodt would require "continued access to operating capital" as well as continued "support" and "investment" to be successful.[145]

> Talking points circulated in advance of the Spinoff conceded that there was risk to the company because of its "capital structure and financial obligations at the time of the spinoff."[146]

> July 2012 Board meeting presentations warning that the liquidity of the newly spun off Mallinckrodt would be far below that of its peers, with final ratings potentially below BBB-.[147]

> Board presentations noted that "Pharma launch cash of $150M" is "80% of peer median." The presentation further stated "Pharma's high debt to capital ratio due to low estimate equity." The board was also told that there were "macro

---

[142] Amended Compl. ¶ 261.
[143] *Id.* ¶ 297.
[144] *Id.* ¶ 261.
[145] *Id.* ¶¶ 261, 298.
[146] *Id.* ¶ 259.
[147] *Id.* ¶ 264.

environmental issues . . . [regarding] opioids" with which Mallinckrodt would have to contend.[148]

Covidien's professionals observed that "the pharmaceuticals business has received a disproportionately small allocation of capital" relative to the rest of Covidien and that "while the pharmaceuticals business has consistently generated significant cash flows . . . [Covidien] has represented to us that it has not reinvested a majority of that generated cash in the pharmaceuticals business."[149]

A February 2013 presentation to the new Mallinckrodt board stating that that "net sales growth in FY 2013 driven by Exalgo" and that risks included "contingent liabilities" which Mallinckrodt would attempt to address through "balance sheet de-risking." The presentation also informed them that "cash flow will remain a key focus area post spin."[150]

On June 25, 2012, Matthew Harbaugh, the future CFO of Mallinckrodt, expressed concern about the amount of debt that Covidien was putting onto Mallinckrodt, stating "Covidien is providing $150M in cash against $900M in debt with next debt at $750M. . . . We need to get the $900M down further and keep the $150M in a perfect world. Hopefully our soon to be officially added Board members can influence accordingly. . . ."[151]

On January 16, 2013, Standard & Poor's provided Mallinckrodt plc with a BBB- rating (a rating just above "junk bond" status), noting the company's dependence on opioids.[152] Shortly thereafter, Mark Trudeau, then-president of the pharmaceutical division still at Covidien (later CEO of the newly independent Mallinckrodt) received an article from the Business Journal that discussed one analyst's conclusion that "concentration in pain is now something that is hardly viewed as an attractive assets. . . [M]ost large pharmaceutical companies have abandoned pain management or gradually phased it out because of government scrutiny and regulation." The analyst also concluded that during its time with Covidien, "Mallinckrodt was starved for capital."[153]

These allegations, combined with allegations regarding the difficulty in obtaining a solvency

opinion, including (1) that there might be a need for Duff & Phelps to provide one if Goldman

Sachs would not; (2) that neither company ultimate did provide one; and (3) that the one that was

---

[148] *Id.*

[149] *Id.* ¶ 257.

[150] *Id.* ¶ 266.

[151] *Id.* ¶ 274.

[152] *Id.* ¶ 268.

[153] *Id.* ¶ 269.

obtained by Houlihan Lokey did not consider any opioid-related liabilities,[154] are sufficient for me to find that, at this stage of the case, this badge of fraud is present.

While Covidien disagrees, pointing to Mallinckrodt's ability to issue more than $1 billion in unsecured debt in connection with the Spinoff and the fact that its market capitalization immediately after the spin was $2.5 billion, neither of these things do more than raise an issue of fact for resolution at a later time. The question before me now is simply whether the Trust has alleged insolvency as a badge of fraud. I find that it has.

*Reasonably equivalent value*

The next badge of fraud looks at whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." 6 Del. C. § 1304(b)(8). The Trust has alleged that it received nothing in exchange for the Cash Transfers, the Indemnity Obligations, and Tax Obligations, and that Covidien took the proceeds from the Note Issuance, leaving Mallinckrodt with only the debt from the issuance and a business segment that while profitable at the time was marked for ruin. Covidien does not directly challenge that this badge of fraud is present here, but instead addresses it only in combination with the insolvency badge, arguing that the two are the elements of a constructive fraudulent transfer and therefore are entitled to little weight standing alone. I agree, but here they are not standing alone. I find that the badge of a lack of reasonably equivalent value is present here.

*Concealment of the Transfer*

The next badge of fraud is that "the transfer or obligation was disclosed or concealed." 6 Del. C. § 1304(b)(4). *Maxus*, 641 B.R. at 517 ("A third badge of fraud exists when a transferor

---

[154] *Id.* ¶¶ 296, 299-300.

or transferee "concealed the nature and existence of transfers from Debtor's creditors at the time the transfers were made.").

The Trust argues that this badge is present because while the Spinoff itself was publicly announced, the fraudulent nature of the Spinoff, specifically the effect it would have on creditors, was concealed.  I disagree.  While the Trust has alleged that the facts necessary to determining the fraudulent nature of the Spinoff may not have been known to all of the creditors that were ultimately impacted by it, the Trust has not alleged facts that would support the conclusion that the Spinoff, or its component Transfers, were concealed.  I find that this badge is not present.[155]

*Retaining possession or control*

The last badge of fraud addressed by the parties is that "the debtor retained possession or control of the property transferred after the transfer."  6 Del. C. § 1304(b)(2).

The Trust argues that it has alleged that Covidien had full control of Mallinckrodt prior to the Transfers, dictated the terms of the Transfers, then retained control of the newly "independent" Mallinckrodt entities after the Transfer by, among other things, leaving Mallinckrodt with obligations that limited its ability to operate separately from Covidien. Covidien argues that this badge of fraud does not apply to the Spinoff because it only applies where the debtor retains possession or control of property transferred and here there is no suggestion that Mallinckrodt retained the transferred property.  I disagree.

While Covidien is correct that Section 1304(b) refers to the debtor's retention of control over the transferred property, as noted above, it is Covidien's intent that is relevant here, not the

---

[155] This does not alter the conclusion, set forth above, that the triggering creditors in whose shoes the Trustee stands may not have known of the fraudulent nature of the transaction at the times relevant to the statute of limitations inquiry.

Debtor's.[156]  The Trust has alleged numerous ways in which Covidien ensured that it would

retain control over Mallinckrodt after the Spinoff, including: (1) refusing to grant Mallinckrodt

separate counsel prior to the Spinoff; (2) selecting the new Mallinckrodt's leadership team; (3)

requiring Mallinckrodt to execute a joint defense agreement in which Mallinckrodt would be

bound "as if it remained a subsidiary of Covidien[.]"; (4) requiring MIFSA (Mallinckrodt's third

party borrower) to borrow only from Covidien's affiliates; (5) requiring Mallinckrodt to enter

into a Tax Matters Agreement that prohibited Mallinckrodt from engaging in certain activities

for two years following the Spinoff (which agreement referred to Mallinckrodt as "the

Controlled"); (6) requiring Mallinckrodt to assume the obligation to indemnify Covidien for

opioid liabilities arising after the Spinoff, and (7) requiring Mallinckrodt to enter into a transition

services agreement that kept Mallinckrodt reliant on Covidien's infrastructure for 2 years after

the Spinoff.

This badge is sufficiently pled.

_Removal or Concealment of Assets_

The next badge of fraud is the removal or concealment of assets."[157]  6 Del. C. §

1304(b)(7).  Although the parties have not addressed this badge, I find it is relevant here, given

the allegations in the Amended Complaint that Covidien transferred approximately $867 million

of cash out of Mallinckrodt to Covidien in the years leading up to the Spinoff.   As the Third

Circuit explained in _MSKP Oak Grove, LLC v. Venuto_, concealment is not necessary for this

badge; removal of assets alone is sufficient:

> Finally, there is strong evidence of a third badge of fraud: whether Hollywood
> Tanning "removed or concealed assets." The District Court found that Hollywood

---

[156] See footnote 123, _supra_.

[157] As noted above, considering the alter ego allegations and the fact that Covidien does not appear to
dispute that its intent, not the Debtors', is relevant here, the appropriate inquiry here is whether Covidien
removed or concealed assets, not the Debtors.

> Tanning never concealed the shareholder distributions. Even so, as the court seemingly acknowledged, it did *remove* assets. The $23.4 million went from corporate to individual accounts, out of the reach of creditors. Though the Venutos try to distinguish shareholder distributions from removals, nothing in the statute or case law draws that distinction. *Cf. Gilchinsky*, 732 A.2d at 490-491 (finding that debtor removed assets by transferring them from her ERISA account to her IRA). Badge (g) is present too.

*MSKP Oak Grove, LLC v. Venuto*, 839 Fed. Appx. 708, 712-713.  Here, because the Trust has alleged the removal of assets, this badge is present.

<u>Natural Consequences of an Action</u>

"A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent." *In re Tribune Co.*, 464 B.R. at 162.  "While the badges of fraud provide a basic rubric, courts examine the totality of the circumstances to determine whether fraudulent intent exists." *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, Nos. 08-11407 (BLS), 10-51389 (BLS), 2016 Bankr. LEXIS 988, at *14 (Bankr. D. Del. Feb. 8, 2016).  "If the 'natural consequence' of a debtor's actions is that its creditors were hindered, delayed or defrauded, a court is more likely to find that an intentional fraudulent transfer occurred." *In re Tribune Co.*, 464 B.R. at 162.  *See also In re Tronox Inc.*, 503 B.R. 239, 279-80 (Bankr. S.D.N.Y. 2013) (observing that "actual intent" is satisfied when the consequences of an act are substantially certain to result from it).

"The Debtors are presumed to intend the natural consequences of their acts." *SB Liquidation Tr.,* 2016 Bankr. LEXIS 988, at *19.  Here, I find that it is reasonable to conclude that the hindrance of Debtors' creditors was substantially certain to occur following the Spinoff, considering the totality of the circumstances.  The Amended Complaint alleges that at the very same time that the opioid epidemic was at its peak, when the company's competitors and customers were being sued and fined, and when Mallinckrodt itself was the target of

investigations, Covidien was both increasing Mallinckrodt's potential opioid liability by doubling down on sales and marketing strategies that it knew were problematic while at the same time siphoning off the profits from these increased sales, increasing Mallinckrodt's debt, and extricating itself from liability before the inevitable day of reckoning was upon them.  That these actions would hinder, delay, or defraud Mallinckrodt's creditors can come as no surprise.

In sum, I find that the Trust has pled facts that support the presence of seven of the statutory badges of fraud.  I further conclude that the totality of the circumstances supports the reasonable inference that Covidien's board of directors possessed the requisite intent to hinder, delay, or defraud the Debtors' creditors in approving the Spinoff.   Covidien's Motion to Dismiss the Actual Fraudulent Transfer Claims is therefore denied.

## III.    Constructive Fraudulent Transfer

### A. Timeliness

In Counts II, IV, VI, and VIII of the Amended Complaint, the Trust asserts claims for constructive fraud under "UFTA or other applicable law."  Under any of the UFTA laws potentially applicable here (*i.e.*, Delaware, Missouri, Massachusetts, or New Jersey)[158] claims for constructively fraudulent transfers must be filed within four years of the time the transfer was made or the obligation was incurred.[159]  Because more than four years have passed since the

---

[158]   As noted above, the possible choices of law based on the locus of the parties and events are DE, MO, and MA.  As discussed in more detail below, due to its reliance on a New Jersey government entity as its triggering creditor for its constructively fraudulent transfer claims, the Trust asserts that New Jersey law governs the question of the timeliness of its constructively fraudulent transfer claims.

[159]   6 Del. C. § 1309 ("A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought: (2) Under § 1304(a)(2) or § 1305(a) of this title, within 4 years after the transfer was made or the obligation was incurred."); 109A Mass. Gen. Laws Ann. § 10 ("A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought: (b) under paragraph (2) of subsection (a) of section five or subsection (a) of section six, within four years after the transfer was made or the obligation was incurred"); and § 428.049 R.S. Mo. ("A claim for relief or cause of action with respect to a fraudulent transfer or obligation under sections 428.005 to 428.059 is extinguished unless action is brought: (2) under subdivision (2) of subsection 1 of section 428.024 or subsection 1 of section 428.029, within four years after the transfer

Transfers, the Trust relies on the existence of certain predicate or "triggering" creditors that it asserts have the benefit of an extended period of time within which to file their claims. Specifically, the Trust alleges that it can stand in the shoes of either the New Jersey Division of Medical Assistance and Health Services (the "**NJ Division of Health**") or the Internal Revenue Service (the "**IRS**"), who both have ten-years from the date of transfer to assert their claims.

Covidien moves to dismiss on the grounds that the proposed triggering creditors could not assert claims against the Debtors because such claims would either be time-barred, or the creditors lack standing to assert them.

### 1. *New Jersey Division of Health*

The Trust argues that by using the NJ Division of Health as its triggering creditor, it is not bound by UFTA's four-year statute of repose but is instead entitled to a ten-year limitation period applicable to state governmental entities under New Jersey law.[160]  Covidien disagrees and argues that the Trust has not pled facts that would support the conclusion that New Jersey law would apply to its claims.

The Trust has not specified in its Amended Complaint which state's laws applies to its claims.  The options, based on the parties' arguments, are New Jersey, Delaware, Missouri, and Massachusetts.  The limitations period of each is the same, but the New Jersey Supreme Court

---

was made or the obligation was incurred"); N.J. Stat. § 25:2-20 ("A claim for relief with respect to a transfer or obligation under this article is extinguished unless action is brought: (b) Under paragraph (2) of subsection a. of R.S. 25:2-25 or subsection a. of R.S.25:2-27, not later than four years after the transfer was made or the obligation was incurred").  As discussed above, these provisions, unlike those applicable to actual fraud claims, are statutes of repose, not statutes of limitations. This is clear from the fact that it is triggered by the transfer without regard for when an injury occurs or a claim arises.  *Worker's Comp. Fund v. Kent Constr. Corp.*, No. 07A-06-008 FSS, 2008 Del. Super. LEXIS 352, at *9 (Del. Super. Ct. Sep. 19, 2008) ("A statute of repose, however, can begin to run before the cause of action arises because it begins 'irrespective of the date of injury.' In other words, when the cause of action triggers the statute, it is a statute of limitations. When the cause of action is not the trigger, it may be a statute of repose.") (quoting *Cheswold*, 489 A.2d at 420).

[160] The New Jersey statute, while previously known as the Uniform Fraudulent Transfer Act, is now the Uniform Voidable Transactions Act.  See N.J. Stat. § 25:2-20.

has held that New Jersey governmental entities are not bound by the New Jersey UFTA

limitations period. *See State Dep't of Envtl. Prot. v. Caldeira*, 171 N.J. 404, 416, 794 A.2d 156,

164 (2002) (applying ten-year statute of limitations set forth in N.J.S.A. 2A:14-1.2 to the State

rather than extinguishment provision in New Jersey's UFTA because "the UFTA statute of

limitations is a general provision that does not expressly and specifically apply to the State.").

For that reason, there is a conflict among the laws that is outcome determinative here.  If New

Jersey law applies, then the Trust's claims are timely.  If any of the other laws apply, then the

Trust's claims are not timely and must be dismissed.

While the Trust argues that pursuant to this Court's decision in *Maxus Liquidating Trust*,

claims asserted by state governmental entities are governed by the law applicable to the state

itself, there is little authority to support this conclusion.  The Trust points to Judge Sontchi's

statement that "[t]he Court sees no logical reason why a state government creditor could not

serve as a triggering creditor, with the obvious caveat that the statute of limitations for a state

creditor's fraudulent transfer claim is governed under the state fraudulent transfer law applicable

to the state itself." *Maxus*, 641 B.R. at 543.  But the Trust ignores Judge Sontchi's statement

earlier in the opinion that he was merely assuming without deciding that the law of the triggering

creditor's home state would be the applicable law:

> A choice of law analysis is a fact-intensive inquiry which the Court finds
> currently unnecessary. **Solely for purposes of this analysis will the Court
> assume, without deciding, that each triggering creditor's fraudulent transfer
> claim is analyzed under the substantive law of that triggering creditor's
> respective home state rather than Delaware law.** In any event, there is no
> material difference between the statutes of repose for fraudulent transfer claims
> under Delaware, Wisconsin, or Ohio law.

*Id.* at 543 n.263 (emphasis added).  The Trust cites to nothing further in support of its proposition

that New Jersey law applies to its claims, but instead simply highlights Judge Sontchi's

observation that a choice of law analysis is a fact intensive inquiry, which it argues means that the inquiry is not appropriate on a motion to dismiss.

Covidien argues, however, that because the question before me is one regarding the applicable limitations period, no factual analysis is required.  Instead, Delaware's choice of law rules require that the court simply apply the shorter of either the Delaware limitations period or the foreign limitations period to claims, like the Trust's, that arise out of state.  I agree.

"Bankruptcy courts apply the limitations period of the state in which they sit. *In re W.R. Grace & Co.*, 397 B.R. 701, 704 (Bankr. D. Del. 2008).  In Delaware, where a cause of action arises outside of the state,[161] courts apply the state's "borrowing statute," which provides:

> Where a cause of action arises outside of [Delaware], an action cannot be brought [here] to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state . . . where the cause of action arose, for bringing an action upon such cause of action.

10 Del. C. § 8121.  Applying the plain terms of this statute here would mean that the Trust's claims are governed by Delaware's four-year limitations period rather than New Jersey's ten-year limitations period, thereby extinguishing the Trust's claims.

The Trust argues that the borrowing statute only applies to cases where there are allegations of forum shopping, citing the Delaware Supreme Court's ruling in *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1, 16 (Del. 2005).  In *Saudi Basic*, the Court affirmed the Superior Court's refusal to apply the borrowing statute where doing so would have rewarded the plaintiff for forum shopping.  As the Court explained:

> ExxonMobil's claims arose under Saudi law, which imposes no time bar upon those claims. If ExxonMobil had prosecuted their overcharge claims in Saudi Arabia, their claims would not be time-barred. But ExxonMobil did not assert

---

[161] It is not necessary for me to determine where, as among the available choices, the cause of action arose because while there may be some dispute between the parties as to whether it arose in New Jersey or Massachusetts, no one contends that it arose in Delaware.

these claims in Saudi Arabia, or bring suit in Delaware as plaintiff to enforce those claims against SABIC. Rather, it was SABIC who came to Delaware to obtain an adjudication that *(inter alia)* Delaware's three year statute of limitations barred ExxonMobil's claims. Given the nature of SABIC's affirmative claim for declaratory relief, ExxonMobil was entitled to assert its overcharge causes of action as counterclaims for damages. In these circumstances, as the trial judge found, the party that was "shopping for the most favorable forum" was SABIC, not ExxonMobil.

The trial judge recognized that to apply the borrowing statute to ExxonMobil would subvert the statute's fundamental purpose, by enabling SABIC to prevail on a limitations defense that would never have been available to it had the overcharge claims been brought in the jurisdiction where the cause of action arose, *i.e.,* Saudi Arabia.

*Id.* at 17-18. While the Trust suggests that *Saudi Basic* should be read as holding that the borrowing statute does not apply where there is no evidence of forum shopping, I must disagree. As the Chancery Court explained in *CHC Investments, LLC v. FirstSun Capital Bancorp,* although there has been some inconsistency in how courts have applied the *Saudi Basic* ruling, the majority approach "interprets *Saudi Basic* to hold that the plain language of the borrowing statute governs unless the party asserting the underlying claim was forced into a Delaware forum." No. 2018-0353-KSJM, 2020 Del. Ch. LEXIS 101, at *9 (Del. Ch. Mar. 23, 2020). Under this approach,

the court first applies the plain language of borrowing statute. If Delaware's limitations period applies, the court next determines whether the party asserting the underlying claim was forced to file in Delaware. If the party asserting the underlying claims was forced to file in Delaware, then the court applies the foreign limitations period.

*Id.* (applying Delaware's limitations period to plaintiff's claims, filed in Delaware pursuant to forum selection clause). *See also US Dominion, Inc. v. Fox Corp.*, No. N21C-11-082 EMD CCLD, 2022 Del. Super. LEXIS 258, at *19 (Del. Super. Ct. June 21, 2022) (applying borrowing statute, noting "[i]t does not appear that Dominion was "forced" to file its claims in Delaware.

Under the majority approach to *Saudi Basic*, therefore, Delaware's limitations period applies to Dominion's claims.").

Here, the Trust makes no argument that it was forced to file its suit in Delaware. Accordingly, applying the plain language of the borrowing statute, the claims of the Trust (standing in the shoes of the New Jersey Division of Health), which arose outside of Delaware, would be subject to Delaware's limitations period, which is shorter than New Jersey's. *See Miller v. Fallas (In re J & M Sales, Inc.)*, 2021 Bankr. LEXIS 2268, *72-73 (Bankr. D. Del. Aug. 2, 2021) (holding DUFTA's four-year limitation period applies to state governmental entities).

While the Trust argues that it has also pled that other governmental units held allowable unsecured claims against one or more of the Debtors,[162] all such creditors having been identified by the Trust as New Jersey government creditors, they would each be subject to the same fate. Since more than four years have passed since the Transfers, the constructive fraudulent transfer claims asserted by the Trust, standing in the shoes of the New Jersey Division of Health, are untimely.

### 2.   *IRS*

The Trust next argues that it can stand in the shoes of the U.S. Internal Revenue Service ("**IRS**") to asserts its constructive fraudulent transfer claims based on the fact that the IRS filed several claims in the Debtors' bankruptcy cases.  The IRS, the Trust argues, unlike state creditors, is not subject to the limitations periods contained in state laws.  *See Maxus*, 641 B.R. at 545 (applying the doctrine of *nullum tempus* to the Environmental Protection Agency and holding that "'when seeking to avoid fraudulent transfers via application of state law, [the federal government] is not subject to the state's extinguishment period'") (citing *Hillen v. City of Many*

---

[162] Amended Complaint ¶ 311.

*Trees, LLC (In re CVAH, Inc.)*, 570 B.R. 816, 835 (Bankr. D. Idaho 2017).  Instead, the Trust

argues, the IRS has the benefit of a ten-year collection period set forth in federal law.  *See* 26

U.S.C. § 6502(a)(1) ("Where the assessment of any tax imposed by this title has been made

within the period of limitation . . . , such tax may be collected . . . within 10 years after the

assessment of the tax[.]")

Covidien does not disagree with the Trust's suggestion that the federal government is not

bound by state statutes but argues that the Trust's ability to rely on the IRS as its triggering

creditor has limits.  Specifically, Covidien argues that the IRS is not an appropriate triggering

creditor here because while the IRS filed proofs of claim against six of the sixty-four separate

Mallinckrodt debtors, none of those six is alleged to have made any of the challenged transfers.  I

agree.

Generally speaking, a trust asserting a claim under Section 544(b) can only avoid a

transfer if the predicate creditor had a claim against the specific debtor that made the transfer.

*Kelley v. Opportunity Fin., LLC (In re Petters Co.)*, 550 B.R. 438, 444 (Bankr. D. Minn. 2016)

("a right of avoidance for a bankruptcy estate under § 544(b) must be anchored to the debtor's

pre-bankruptcy past--based on actual pre-petition facts in which that debtor features as a

participant, linked directly to the pre-petition right of a creditor of <u>that</u> debtor") (emphasis

added); *Peterson v. Colony Am. Fin. Lender LLC*, 634 B.R. 1010, 1022 (Bankr. N.D. Ill. 2021)

("a trustee can only avoid a transfer if there was a predicate creditor <u>with 'a claim against the</u>

<u>transferor</u> that was enforceable under nonbankruptcy law and that gave the creditor standing to

sue the transferee then under the law of fraudulent transfer.'") (quoting *Kelley*, 550 B.R. at 454)

(emphasis added).  Here, although the IRS filed nine proofs of claim in the Debtors' bankruptcy

cases, [163] none of them was filed against any of the debtors that were actually involved in the

challenged Transfers.[164]   Thus, the Trust has not identified triggering creditors for the debtors

who made the allegedly fraudulent transfers.

The Trust argues that it is not required to identify a triggering creditor for each

transferring debtor because the Amended Complaint alleges facts showing that Covidien and

Mallinckrodt operated as a single economic enterprise and were alter egos of one another.[165]   I

disagree.   Even assuming I found the allegations of the Amended Complaint sufficient to

conclude that Covidien was the alter ego of all the Mallinckrodt entities, that would do nothing

to justify ignoring the separate existence of the individual Mallinckrodt entities.   The facts

alleged in the Amended Complaint are only suggestive of a "vertical" alter ego scheme, that is

the failure to observe the corporate separateness of a parent and its subsidiaries.   But the Trust's

argument that I should treat a claim against one debtor as a claim against all of the Debtors

would require allegations of a "horizonal" alter ego scheme, *i.e.*, a failure to observe the

corporate separateness of the individual Mallinckrodt entities.   No such allegations were made

here.   The case on which the Trust relies in support of its argument is distinguishable for this

reason.   *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 336 (S.D. Tex. 2008)

---

[163] The IRS filed proofs of claim against the following debtors: Mallinckrodt Equinox Finance LLC, Mallinckrodt Enterprises LLC, Mallinckrodt Critical Care Finance LLC, Mallinckrodt ARD Holdings Inc., ST US Holdings LLC, and ST Shared Services LLC.   Millar Declaration, Adv. D.I. 16, Ex. 13. While this information is not found in the Amended Complaint, by referencing the IRS' claims against the Debtors in its allegations, the proofs of claim are properly considered "incorporated" into the pleading and their contents are therefore appropriately considered on a motion to dismiss.   *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'") (alterations in original) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)).

[164]   The Amended Complaint identifies seven debtor entities as involved in the Transfers:   Mallinckrodt Holdings Inc., Mallinckrodt U.S. Pool LLC, United States Surgical Corporation, Mallinckrodt Jameson Company, Mallinckrodt Group S.a.r.l., MIFSA, and Mallinckrodt plc.   Amended Compl. ¶¶ 271, 273-284.

[165] Opposition Br. at 35.

(holding that debtor ASARCO had standing to avoid fraudulent transfer made by affiliate SPHC, because ASARCO and SPHC were found to be alter egos).[166]  Because the Trust has not alleged facts supportive of the conclusion that the non-transferring debtors were the alter egos of the transferring debtors, it cannot use the triggering creditor of those non-transferring debtors to avoid a transfer made by a transferring debtor.

The Trust next argues that if the Court were to apply the "collapsing doctrine" to the Spinoff and collapse the many steps into a single transaction, the IRS would clearly be a proper triggering creditor.  I again disagree.  The Trust is correct that "[i]n analyzing a fraudulent transfer claim where there are multiple transactions, courts may collapse the steps, exchanges, and transactions that are 'part of one integrated transaction' to examine the substance, rather than the form, of the transactions." *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 617 B.R. 496, 504 (Bankr. D. Del. 2020).  But even assuming, *arguendo*, it would be appropriate to apply the collapsing doctrine here, collapsing the various steps of the Spinoff into a single transaction would do nothing to help salvage the Trust's claim because the Trust has not alleged that any of the six debtors against whom the IRS asserted claims were involved in any step of the Transfers. *See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 269 (Bankr. D. Del. 2018) ("The collapse doctrine does not allow the court to collapse separate entities, or pierce the corporate veil, or disregard the corporate form."); *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 617 B.R. 496, 505 (Bankr. D. Del. 2020) ("Contrary to the Trustee's contentions, collapsing the Restructuring transactions . . . does not expand the property rights of the Debtors such that the Trustee may recover property (or the value thereof) to which the Debtors were never entitled pre-Restructuring.").

---

[166] *Id*. at 30.

Finally, the Trust argues that the Court can simply infer that the IRS was a creditor by viewing the allegations of the Amended Complaint in their entirety.  Specifically, the Trust suggests that since it has alleged that Mallinckrodt's sales strategies ensured ever-increasing profits, and with profits come claims for income taxes, that it is reasonable to conclude that the IRS was likely a creditor at the time of the Transfers.[167]  I am not persuaded by this narrative and believe it would be patently unreasonable to draw such tenuous inferences from the facts alleged. *Simner v. LG Elecs. U.S.A., Inc.*, No. 21-13322(SDW)(CLW), 2023 U.S. Dist. LEXIS 76814, at *21 (D.N.J. May 1, 2023) (dismissing vague pleading that did "not include particularized allegations, but rather necessitates leaps of inference based on speculation.").

Having found there to be no basis to treat a transfer made by a debtor on an individual basis as a transfer made by another or by all, the Trust's attempt to use the IRS as a triggering creditor here fails for lack of standing.

Because the only triggering creditors that the Trust has identified would not have allowable claims under applicable state law, the Trust cannot state a claim pursuant to Section 544(b) for constructive fraudulent transfer.[168]  For that reason, the Motion is granted with respect to the constructive fraudulent transfer claims and Counts II, IV, VI, and VIII of the Amended Complaint are dismissed.

**IV.**     **Breach of Fiduciary Duty**

In Count IX of the Amended Complaint, the Trust asserts a claim for breach of fiduciary duty as a promoter.  Covidien has moved to dismiss on the basis that the Trust's claim is time-

---

[167] *Id*. at 33.

[168] Because the Trust cannot rely on the IRS as a triggering creditor due to the IRS' lack of standing, I do not need to reach Covidien's second argument that the IRS could not serve as triggering creditor because it did not have an allowable claim against the Debtors at the time of the transfer.  Nor do I need to reach Covidien' argument that the Trust's constructive fraud claim fails on the merits.

barred.  Specifically, Covidien argues that under either of the two options it contends are

appropriate, the Trust's claims are untimely.  Under either Delaware law (which imposes a three-

year limitations period) or Irish law (which imposes a six-year limitations period), the statute of

limitations has run.  10 Del. C. § 8106; Statute of Limitations Act 1957 (Act No. 6/1957) §

11(2)(a) (Ir.).   The Trust does not disagree that its claim would be barred under the laws of

Delaware or Ireland, but instead counters that its claim is timely under Massachusetts law, which

should govern because of the state's relationship to Covidien.  Like Delaware, Massachusetts

imposes a three-year statute of limitations on breach of fiduciary duty claims, but unlike

Delaware, Massachusetts recognizes the tolling doctrine of adverse domination in situations

where a "company is under the control of culpable directors and officers."  *Aiello v. Aiello*, 852

N.E.2d 68, 78-79 (Mass. 2006) ("[A] statute of limitations may be tolled where the requirements

of the adverse domination doctrine are established."); *Eugenia VI Venture Holdings, Ltd. v.*

*Maplewood Holdings LLC (In re AMC Inv'rs, LLC)*, 524 B.R. 62, 81 (Bankr. D. Del. 2015)

 ("It also appears that Delaware courts do not recognize adverse domination—when a

corporation's board is controlled by culpable directors— as a basis for tolling a breach of

fiduciary duty action.").  Since application of the adverse domination doctrine is appropriate

here, the Trust contends, under Massachusetts law, its claims are timely.

As noted above, a bankruptcy court applies the choice-of-law rules of the state where it

sits. *In re PHP Healthcare Corp.*, 128 Fed. App'x. 839, 843 (3d Cir. 2005); *In re Art Inst. of*

*Phila.*, No. 18-11535, 2022 WL 18401591, at *5 (Bankr. D. Del. Jan. 12, 2022).  Where, as here,

the cause of action arose outside of the state,[169] Delaware courts apply the state's "borrowing

statute," to determine which state's limitations periods applies.  It provides:

> Where a cause of action arises outside of [Delaware], an action cannot be brought
> [here] to enforce such cause of action after the expiration of whichever is shorter,
> the time limited by the law of this State, or the time limited by the law of the state
> . . . where the cause of action arose, for bringing an action upon such cause of
> action.

10 Del. C. § 8121.[170]  In determining the "time limited" by the laws of the respective states at

issue, the Court must consider the effect of applicable tolling principles.  *Amoroso v. Joy Mfg.*

*Co.*, 531 A.2d 619, 620 (Del. Super. Ct. 1987) ("The 'time limited' by the law of Delaware for

the purpose of § 8121 is ascertained by reference to the statute of limitations applicable to the

plaintiff's claim and any principles governing the tolling of the statute of limitations.").

   While on their face, the limitations periods of Delaware and Massachusetts are the same,

application of the adverse domination doctrine on which the Trust relies (a doctrine not

recognized under Delaware law), would have the effect of making the Massachusetts' limitations

period longer than Delaware's.   Accordingly, under the plain language of the borrowing statute,

Delaware's limitations period, as the shorter one, applies.  Although the Trust argues that the

borrowing statute should not apply at all given the facts of this case, I have already rejected this

argument, as discussed above in the section addressing the constructive fraudulent transfer

claims.  Having concluded that the borrowing statute applies equally to the Trust's fiduciary duty

---

[169] It is not necessary for me to determine where, as among the available choices, the cause of action arose
because while there may be some dispute between the parties as to whether it arose in Massachusetts or
Ireland, no one contends that it arose in Delaware.

[170] While the Trust argues that application of the "most significant relationship" here would result in the
conclusion that Massachusetts law applies to its fiduciary duty claim, I do not need to apply that test
where the question can be resolved by application of the borrowing statute.  *Cal. Dep't of Gen. Servs. v.
W.R. Grace & Co. (In re W.R. Grace & Co.)*, 418 B.R. 511, 517 (D. Del. 2009) (applying "most
significant relationship" test only after concluding that the borrowing statute failed to resolve the choice
of law issue and noting that "to ascertain the statute of limitations relevant to a particular action, the Court
must initially rely on Delaware's borrowing statute").

claim, that claim is subject to Delaware's three-year limitations period and has therefore been extinguished. Covidien's motion to dismiss Count IX of the Amended Complaint is therefore granted.

## V.       Reimbursement, Indemnification, or Contribution

In Count X of the Amended Complaint, the Trust asserts a claim for "reimbursement, indemnification, or contribution," alleging that Covidien is jointly and severally liable with the Debtors for the more than $2 billion in opioid-related liabilities and expenses that Debtors have incurred to date on the grounds that Mallinckrodt was Covidien's alter ego and that, at the time the liability was incurred, Covidien exercised complete domination and control over Mallinckrodt.

Covidien has moved to dismiss on the basis that the Trust has not alleged facts sufficient to support disregarding corporate separateness.[171]  Specifically, Covidien argues that the Trust has not alleged the "extraordinary circumstances" required to establish that Mallinckrodt was Covidien's alter ego or that any veil should be pierced, but instead merely alleges the standard sorts of arrangements that exist all the time between a parent and its subsidiaries – that Covidien and Mallinckrodt shared corporate services and an integrated cash management system, and that Covidien's board of directors exercised high-level oversight over the ultimate business decisions of Mallinckrodt.  This, it argues, is not enough to justify disregarding the corporate form.  While I agree with the general notion that shared corporate services and a corporate parent's oversight

---

[171] Covidien makes two other arguments in its opening brief, but neither warrant extended discussion. While Covidien argues in its opening brief that Count X fails under Rule 8 because the Trust does not include allegations regarding its legal theory in the averments section of the Amended Complaint, Covidien acknowledges in the same breath that other parts of the Amended Complaint include allegations from which Covidien was able to surmise that theory of liability the Trust is asserting is alter ego or veil piercing.  D.I. 15, Opening Br. at 41.  Additionally, Covidien's argument that the Trust may lack standing to assert its claims because some states permit only creditors to piece the corporate veil is unpersuasive. In support of this argument, Covidien cites to a case interpreting California law, but it fails to explain how it might be possible for California law to apply in this case.

is not enough to justify piercing the corporate veil, I disagree with Covidien's suggestion that those are the only things the Trust has alleged here.

"[I]n order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001). *See also Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 555 (Bankr. D. Del. 2012) ("A subsidiary is an alter ego or instrumentality of a parent entity 'when the separate corporate identities . . . are a fiction and . . . the subsidiary is, in fact, being operated as a department of the parent.") (internal citations omitted). "This demonstration is made through a two-part test. Plaintiffs must show (1) that the companies operated as a single economic unit; and (2) the presence of an overall element of injustice or unfairness." *Id.*

In the Third Circuit, whether a corporation and its shareholders existed as a single economic entity is examined through the following set of seven factors: "(1) gross undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of the debtor corporations at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; [and] (7) whether the corporation is merely a facade." *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470-71 (D. Del. 2010). None of these factors is determinative, and a court may find that a corporation and its shareholders existed as a single entity so long as there is "some combination of the above . . . ." *Trevino*, 583 F. Supp. 2d at 529. Additionally, under Delaware law, "the fraud or injustice that must be demonstrated in order to pierce a corporate veil must 'be found in the defendants' use of the

corporate form.'" *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010) quoting *Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 236 (Bankr. D. Del. 2003).

The Trust has alleged enough to support its claim at this stage of the case.  First, it has included pages of allegations that support the conclusion that Covidien and Mallinckrodt functioned as a single entity, to the point that Mallinckrodt lacked the ability prior to the Spinoff to stand on its own.[172]  The Trust asserts that Mallinckrodt and Covidien "maintained an organizational structure that consolidated the design, manufacturing, marketing, sales, promotion, supply, reporting, compliance, administration, and cash management functions of the entire Covidien enterprise into a single, unified economic entity."[173] Several of the Third Circuit's "single economic entity" factors are present throughout the Amended Complaint. The Trust alleges a failure to observe corporate formalities, including that Mallinckrodt did not maintain its own board of directors and that its corporate records were so deficient that Covidien had to generate information during the Spinoff in order for Mallinckrodt to satisfy its public reporting requirements.[174] The Trust has alleged that "Covidien siphoned huge sums of cash out of Mallinckrodt, in the aggregate amount of $867 million" and that Covidien siphoned these funds at a time when Mallinckrodt was undercapitalized and insolvent.[175]  I am satisfied that the first prong of the alter ego test is met.

The Trust has also sufficiently alleged that an overall element of unfairness and injustice is present.  As discussed at length above, the Trust has alleged facts that suggest that Covidien both oversaw and actively participated in Mallinckrodt's aggressive opioid sales and marketing campaign, shared in the massive profits, and then structured a spinoff that allowed Covidien to

---

[172] *See, e.g.*, Amended Compl. ¶¶ 141-84.
[173] *Id.* ¶ 141.
[174] *Id.* ¶ 146.
[175] *Id.* ¶ 255.

shield itself from liability and left Mallinckrodt without the resources to pay those who were harmed.  Moreover, the facts allege that Covidien used the corporate form to perpetrate this injustice.  Specifically, the Trust alleges that Mallinckrodt's lack of corporate separateness (particularly its lack of a board or separate leadership team) enabled Covidien to make all of the decisions regarding the Spinoff and prevented Mallinckrodt from having the opportunity to negotiate on its own behalf or otherwise protect its own interests at all prior to the Spinoff, resulting in a transaction that favored only Covidien to the detriment of Mallinckrodt and its creditors.  I am satisfied that the second prong of the alter ego test is met.

For these reasons, the Motion to Dismiss is denied with respect to Count X.

## VI.   Equitable Subordination

In Count XI of the Amended Complaint, the Trust asserts a claim for equitable subordination pursuant to Section 510(c) of the Code.  Specifically, it alleges that Covidien's claims against the Debtors, which assert a right to indemnification, should be equitably subordinated for purposes of distribution so that Covidien does not receive any distributions from the Trust until all other creditor-beneficiaries of the Trust have been paid in full.  Covidien argues this claim should be dismissed because the Trust has not sufficiently pled the required elements.  I disagree.

Section 510(c) of the Code provides that a court may "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c).  To state a claim for equitable subordination, plaintiff must plead the existence of three conditions:  "(1) '[t]he claimant must have engaged in some type of inequitable conduct;' (2) '[t]he misconduct must have resulted in injury to the creditors of the

bankrupt or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].'" *Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977)).

Covidien first argues that the Trust has failed to plausibly allege any inequitable conduct. "Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Mid-American Waste Sys.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002). As discussed at length above, the Trust has pled all three.

I am not persuaded by Covidien's argument that the Trust's claim must fail because it has not pled facts suggesting there was anything inequitable about Covidien's indemnification claim specifically. To the extent the indemnification rights that Covidien asserts were obtained as part of the Spinoff, inequitable conduct with respect to those rights has been sufficiently alleged.[176] Second, it is not necessary that the inequitable conduct relate to subject matter of the claim that the plaintiff seeks to subordinate. *Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("The inequitable conduct underlying equitable subordination may be 'unrelated to the acquisition or assertion of the particular claim whose status [is] at issue.'") (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir. 1977)). This element has been sufficiently pled.

Covidien next argues that the Trust's claim does not satisfy the second element of the equitable subordination test because it has not alleged that Covidien's alleged wrongful conduct injured a lower priority creditor. Specifically, Covidien argues that its claims against the Debtors

---

[176] *See* Amended Compl., Counts III and IV.

are based on an indemnification provision contained in the Separation Agreement and that the Trust has not alleged that Covidien did anything in obtaining this indemnity right that gave it an unfair leg up on the Debtors' other creditors.  In support of its contention that the Trust must allege that Covidien's conduct harmed other creditors' relative distribution positions Covidien points to the Third Circuit's opinion in *In re Winstar Commc'ns., Inc.*, where it stated that equitable subordination is "designed to 'undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'"  *Shubert v. Lucent Techs. Inc (In re Winstar Commc'ns., Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003)).  But as the *Winstar* Court explained, "'quantification [of harm] may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer.'" *Winstar*, 554 F.3d at 413 (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998).  The Court went on, noting that

> although this court has indicated that a creditor's claim should only be subordinated to the extent necessary to remedy the harm caused by that creditor's misconduct, we have never required the bankruptcy estate to quantify specific harms to the estate or other creditors. Indeed, the key question on appellate review is whether the bankruptcy court's findings demonstrate the "proportionality of the remedy to the injury."

*Id.*  I find that the Trust has alleged that Covidien's conduct with respect to the Spinoff harmed the Debtors' other creditors.  This element has been sufficiently pled.

Finally, Covidien argues that subordination of its claims would be inconsistent with the basic structure of the Code because it would, in effect, be an alteration of the statutory scheme in an effort to reach a more equitable result than that provided for by the distribution scheme in the

Code.  Although Covidien is correct that "a bankruptcy court 'is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable[,]'" *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 93-94 (Bankr. D. Del. 2022), it has offered no reason why subordination of its claims here would alter the statutory scheme in this manner.

For these reasons, the Motion with respect to Count XI of the Amended Complaint is denied.

## VII.   **Equitable Disallowance**

In Count XII of the Amended Complaint, the Trust asserts a claim for equitable disallowance.  Covidien has moved to dismiss this claim on the basis that "the Bankruptcy Code provides no such cause of action."[177]  I agree.  While there are certainly cases that support both sides of the issue, my review of the authority leads me to conclude that equitable disallowance is not a remedy permitted under the Bankruptcy Code.  Support for this conclusion is found both within the Code and in the most recent case law.

Section 502(b) of the Code states that the bankruptcy court "shall" allow a claim unless it falls within one of the nine statutorily specified bases for disallowance, none of which is that the court considers allowance to be inequitable.  While Section 510(c) makes reference to an equitable remedy in the claims allowance process, that remedy is subordination.  No reference is made to equitable disallowance.

In support of its position, the Trust points to a series of cases that begins with *Pepper v. Litton*, 308 U.S. 295 (1939) the only Supreme Court case that expressly addresses the issue. Interpreting the Bankruptcy Act of 1898, the *Pepper* Court affirmed the bankruptcy court's disallowance of claims held by the debtor's controlling shareholder on equitable grounds.  Since

---

[177] Opening Br. at 46.

then, in the absence of Supreme Court authority interpreting the provisions of the modern

Bankruptcy Code, several courts have relied on *Pepper* in concluding that equitable disallowance

remains a viable remedy.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 71 (Bankr.

S.D.N.Y. 2007) (citing to *Pepper* and determining that equitable disallowance is a permissible

remedy), *aff'd in relevant part sub nom. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R.

64 (S.D.N.Y. 2008); *In re Washington Mutual, Inc.*, 461 B.R. 200, 257 (Bankr. D. Del. 2012)

(citing *Pepper* and concluding that the Court "does have the authority to disallow a claim on

equitable grounds 'in those extreme instances – perhaps very rare – where it is necessary as a

remedy") (citations omitted), *vacated in part on other grounds*, 2012 WL 1563880 (Bankr. D.

Del 2012); *Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims*, 160

F.3d 982, 991 n.7 (3d Cir. 1998) (citing *Pepper* and stating, while declining to rule on the issue,

that it did not endorse the district court's conclusion that the bankruptcy court was without

authority to fashion a disallowance remedy). But the vast majority of the cases that have held

equitable disallowance is a valid remedy predate the Supreme Court's opinion in *Law v. Siegel*,

571 U.S. 415 (2014).

Although the *Law* Court did not deal with the validity of equitable disallowance directly,

it did expand on the basic proposition that a bankruptcy court's equitable powers cannot be

exercised in a manner that overrides explicit provisions of the Code.  Specifically, the Court

addressed the question of whether the bankruptcy court's imposition of a surcharge on property

that was exempt under Section 522 in response to the debtor's misconduct contravened Section

522.  The Court found that it did, holding that by imposing the surcharge the bankruptcy court

exceeded the limits of its authority under Section 105(a):

§ 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate. Rather, the statute exhaustively specifies the criteria that will render property exempt.

*    *    *

Moreover, § 522 sets forth a number of carefully calibrated exceptions and limitations, some of which relate to the debtor's misconduct. . . .  The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions.

*Law v. Siegel*, 571 U.S. 415, 423-24, 134 S. Ct. 1188, 1196 (2014).  As courts that have

considered the question since *Law* have observed,

*Law* poses a question that is structurally similar to the one before this Court: does the Code allow a bankruptcy court to exercise its equitable powers to contravene a specific contrary provision of the Code? The issue in this case is a *fortiori* to the issue in *Law* since here the Code is arguably silent on equitable disallowance, except to the extent of course that section 502(b) or section 510(c) can be read as a prohibition of equitable disallowance.

*Harbinger Capital Partners LLC v. Ergen (In re Lightsquared Inc.)*, 504 B.R. 321, 341 (Bankr.

S.D.N.Y. 2013) (concluding equitable disallowance is not permitted under the Code); *Picard v.*

*Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 157 (Bankr. S.D.N.Y. 2014)

(noting that *Law* bolsters the determination that equitable disallowance is not permitted because

just as the *Law* Court concluded that surcharging exempt property on equitable grounds violated

the express terms of Section 522, "the all-inclusive structure of [ ] § 502(b) implies that whatever

is excluded cannot be supplied through § 105(a)").   As the *Lightsquared* Court explained,

in accordance with general rules of statutory interpretation, a plain reading of section 502 of the Bankruptcy Code does not permit equitable disallowance, as it is not among the enumerated exceptions to allowance of a claim. While not expressly ruling on the question of whether equitable disallowance exists as a remedy under the Code, the Supreme Court has held that if there is no basis to disallow a claim under section 502, the claim must be allowed. *Travelers Cas. & Surety Co. of Am. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 449, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007) (holding that, under the Bankruptcy Code, the court "'shall allow' [a] claim 'except to the extent that' the claim implicates any of

the nine exceptions enumerated in § 502(b).") (citing § 502(b)). If Congress had wanted to include a "catch-all" provision for disallowance of claims when the equities of a case justified such a remedy, it could have easily included such a provision in section 502, as it did for equitable subordination in section 510(c). This reading of section 502(b) — that if a claim is not subject to disallowance for any of the reasons specified therein, it must be allowed — is not only consistent with the statute but also with the over-arching principle that the Code should not be employed to void parties' rights under applicable non-bankruptcy law in the absence of specific direction from Congress. The Supreme Court has described this reading of section 502(b)(1) as consistent with both the plain text and with "the settled principle that '[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'" *Travelers*, 549 U.S. at 450 (citations omitted). Simply put, it must surely be the case that if a creditor engages in conduct egregious enough to justify equitable disallowance of its claim, there must be a basis under applicable law to disallow such claim pursuant to section 502(b)(1).

*Harbinger Capital Partners LLC v. Ergen (In re Lightsquared Inc.)*, 504 B.R. 321, 339-41

(Bankr. S.D.N.Y. 2013). I find this reasoning persuasive and hold that the language of Section

502(b) makes it sufficiently clear that equitable disallowance is no longer permissible.

For these reasons, Covidien's Motion to Dismiss Count XII of the Amended

Complaint is granted.

## VIII. <u>Disallowance Under Section 502(d)</u>

Covidien has also moved to dismiss Count XIII of the Amended Complaint, which seeks

disallowance of Covidien's claims against the Debtors if the Trust is successful on its fraudulent

transfer claims. See 11 U.S.C. § 502(d) ("[T]he court shall disallow any claim of any entity . . .

that is a transferee of a transfer avoidable under [Section 544] . . . unless such entity or transferee

has paid the amount, or turned over any such property, for which such entity or transferee is

liable[.]"). Covidien's argument for dismissal of this Count assumes the dismissal of the Trust'

fraudulent transfer claims. Because I have ruled that the actual fraudulent transfer claims can

proceed, this argument is moot. Covidien's Motion is therefore denied with respect to Count

XIII.

## IX.    Disallowance of Claims under Section 502(e)(1)(B)

Lastly, Covidien has moved to dismiss Count XIV of the Amended Complaint, which

seeks disallowance pursuant to Section 502(e)(1)(B) of claims by Covidien for reimbursement,

contribution, or indemnification against the Trust, to the extent Covidien has not expended funds

related to such claims.   Section 502(e)(1)(B) provides that:

> the court shall disallow any claim for reimbursement or contribution of an entity
> that is liable with the debtor on or has secured the claim of a creditor to the extent
> that – (B) such claim for reimbursement or contribution is contingent as of the
> time of allowance or disallowance of such claim for reimbursement or
> contribution

11 U.S.C. § 502(e)(1)(B).   "Three elements must be satisfied in order for a claim to be

disallowed under section 502(e)(1)(B): (i) the claim must be contingent, (ii) the claim must be

for reimbursement or contribution, and (iii) the debtor and the claimant must be co-liable on the

claim." *In re Touch America Holdings, Inc.*, 409 B.R. 712, 715-16 (Bankr. D. Del. 2009).  The

Trust has alleged that during the time Covidien was Mallinckrodt's parent company, it

dominated and controlled the Debtors such that Debtors were the alter egos or mere

instrumentalities of Covidien and, as a result, Covidien is liable with the Debtors for any claims

for which Covidien (a) seeks or may seek reimbursement, contribution, or indemnification; and

(b) Covidien has not expended funds related to such underlying claims.[178]

Covidien has moved to dismiss this claim on two grounds.  First, Covidien argues that at

least some of its claims are not contingent because they seek indemnification for expenses that

Covidien has already incurred.  In support of this argument, Covidien points to the addendums to

its proofs of claim, which sets forth the amount of expenses incurred as of the time the proofs of

---

[178] Amended Compl. ¶ 410.

claim were filed.[179]  But as these same addendums make clear, Covidien's claims are not limited

to the amounts it has already incurred, but also encompass amounts it may incur in the future.

Accordingly, they do nothing to establish that its proofs of claim are not, at least in part,

contingent.  Covidien acknowledges as much in its briefing when it makes its second argument

for dismissal, stating that "the remaining, *contingent* portions of the claims are perfectly

legitimate, and there is no reason why they should be disallowed (or allowed) now."[180]  This

argument, which is essentially that the Trust's claim is premature, fares no better than the first.

Covidien argues that any disallowance of Covidien's claims now would be subject to

reconsideration if and when any portions of Covidien's claims later became liquidated, pursuant

to both the Code and the Debtors' Plan of Reorganization.  *See* 11 U.S.C. § 502(j) and Plan §

IV.Y.2.  While true, this is not a sufficient basis to dismiss the claim.  In fact, doing so on this

basis would be contrary to the plain language of the statute which, by providing for a right of

reconsideration, contemplates the early resolution of contingent claims.

For these reasons, Covidien's Motion to Dismiss Count XIV of the Amended Complaint

is denied.

## X.    <u>Motion to Amend</u>

Following the parties' briefing on the Motion to Dismiss, the Trust moved to amend the

Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), made applicable to these

proceedings by Federal Rule of Bankruptcy Procedure 7015.[181]

Rule 15(a)(2) provides that courts "should  freely  give  leave  when  justice  so

---

[179] See Miller Declaration, Ex. 17 at Addendum ¶ 11 (setting forth incurred expenses of $45,000) and Ex. 18 at Addendum ¶ 17 (setting forth incurred expenses of $15,400).
[180] Opening Br., D.I. 15, at 48 (emphasis added).
[181] Adv. D.I. 33 (Motion to Amend).

requires." Fed. R. Civ. Proc. 15(a)(2).  The Third Circuit has found that Civil Rule 15

"embodies a liberal approach" to amending pleadings.  *Se. Pa. Transp. Auth. v. Orrstown Fin.*

*Servs. Inc.*, 12 F.4th 337, 344 (3d Cir. 2021) (citation omitted); *see also Dole v. Arco Chem.*

*Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990) ("[W]e have held consistently that leave to amend

should be granted freely.");  *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984) ("This

liberal amendment philosophy limits the . . . court's discretion to deny leave to amend.").

Thus, "[l]eave to amend must generally be granted unless equitable considerations render it

otherwise unjust."  *Rodriguez v. Wendover, Inc.*, No. CV 20- 620-CFC, 2020 WL 7490111,

at *3 (D. Del. Dec. 21, 2020) (alteration in original) (quoting *Arthur v. Maersk, Inc.*, 434

F.3d 196, 204 (3d Cir. 2006)).

"Third Circuit courts have extrapolated five instances in which a court may deny leave

to amend a complaint:  (1) if delay in seeking amendment is undue; (2) if delay in seeking

amendment is prejudicial to the opposing party; (3) if delay in seeking amendment is

motivated by bad faith; (4) if the amendment is futile in that it fails to state a claim for which

relief can be granted; or (5) if the movant does not provide a drafted amended complaint." *In re*

*Mortg. Lenders Network, USA, Inc.*, 395 B.R. 871, 876 (Bankr. D. Del. 2008) (citation omitted).

The Third Circuit has remarked that "prejudice to the nonmoving party is the touchstone for

the denial of the amendment."  *Dole v. Arco Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990).

The proposed Amended Complaint adds approximately thirty-eight pages of new

allegations, primarily related to Covidien's domination and control of Mallinckrodt, its

awareness of potential opioid-related liability, and its fraudulent intent in connection with the

Spinoff.   Covidien opposes the Motion to Amend on the basis of undue delay and futility.[182]

---

[182] Adv. D.I. 41 (Opposition to Motion to Amend).

As I stated at oral argument, although the timing of the Trust's Motion to Amend was perhaps less than ideal, its delay in moving to amend was not undue and did not prejudice Covidien.[183]  As the Trust attached a draft of the Amended Complaint to its Motion to Amend, the only basis for denial left to consider is whether the proposed amendments are futile in that they fail to state a claim for which relief can be granted.

"In assessing 'futility,' the [] Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).  "[I]f a claim is vulnerable to dismissal under Rule 12(b)(6)" and "the amendment would not cure the deficiency," leave to amend should be freely denied.  *Id.*  As noted above, my evaluation of the sufficiency of the Trust's claims under Rule 12(b)(6) standards was based on the allegations contained in the Amended Complaint.  Accordingly, with respect to claims that I have dismissed, I have necessarily concluded that the proposed amendments are futile and the motion to amend is denied with respect to those claims.  Conversely, with respect to claims that I have not dismissed, I have necessarily concluded that the proposed amendments are not futile and the motion to amend is granted with respect to those claims. [184]

---

[183] Adv. D.I. 56 (Oral Argument Transcript) at 5.

[184] Because I have dismissed only a portion of the Amended Complaint, it is not necessary, as the Trust suggested at oral argument, for me to include in my ruling a finite period within which the Trust may move to amend any counts dismissed without prejudice in order to preserve the Trust's rights with respect to a limitations period that has lapsed since the filing of the Complaint.  *See SEPTA v. Orrstown Fin. Servs.*, 12 F.4th 337, 348 (3d Cir. 2021) (stating that the general rule "that a complaint that is subsequently dismissed without prejudice is treated for statute of limitations purposes as if it never existed" does not apply where only a portion of the complaint is dismissed) (citing *Brennan v. Kulick*, 407 F.3d 603, 606 (3d Cir. 2005)).

## **CONCLUSION**

For the reasons set forth above, the Motion to Dismiss is GRANTED, and the Motion to Amend is DENIED with respect to the following Counts in the Amended Complaint:

Count II (Constructive Fraudulent Transfer – Spinoff)

Count IV (Constructive Fraudulent Transfer – Indemnity Obligations)

Count VI (Constructive Fraudulent Transfer – Tax Liability)

Count VIII (Constructive Fraudulent Transfer – Cash Transfer)

Count IX (Fiduciary Duty)

Count XII (Equitable Disallowance)

Further, the Motion to Dismiss is DENIED and the Motion to Amend is GRANTED with respect to the following Counts in the Amended Complaint:

Count I (Actual Fraudulent Transfer – Spinoff)

Count III (Actual Fraudulent Transfer – Indemnity Obligation)

Count V (Actual Fraudulent Transfers – Tax Liability)

Count VII (Actual Fraudulent Transfer – Cash Transfer)

Count X (Reimbursement, Indemnification, Contribution)

Count XI (Equitable Subordination)

Count XIII (Disallowance pursuant to Section 502(d))

Count XIV (Disallowance pursuant to Section 502(e)).

The Court will issue a separate order consistent with this Opinion.

Dated: January 18, 2024

JOHN T. DORSEY, U.S.B.J.